No. 29.—Thomas Sealy, plaintiff in error, *vs.* The State of Georgia, defendant in error.

## Indictment for Murder.

A writ of error will not be sustained, even under the statute organizing the Supreme Court, on account of the court below refusing to grant a continuance in a cause, unless it is a most plain and palpaple instance of the arbitrary and oppressive exercise of the discretion necessarily vested in them by the law.

The practice in England, upon the construction of the act of 33d *Edward* 1, of *passing* jurymen, in criminal cases, until the whole panel is exhausted, and a jury not made, before the crown can be called upon to show cause, is not authorized in this State, since the adoption of the Penal Code.

In order to impeach a witness, by showing that he has made contradictory statements, it is not necessary that he absolutely deny the declarations imputed to him. It may be done when he says he does not recollect if the subject matter of these conversations be relative to the issue.

Witnesses who testify *as* to what they saw respecting a transaction after night, and by star-light, aided by lamps upon the surrounding buildings, cannot be impeached by persons who propose to prove that they have made experiments on other nights between the same hours, and with the same degree of light, and were unable to discern objects accurately.

The plaintiff in error was convicted of murder, before Judge Alexander, in the Superior Court of the county of Talbot, at March Term, 1846.

Upon the arraignment, and the issue joined, the prisoner being unable, on account of his poverty, to employ counsel, Hines Holt, Henry L. Benning, Allen F. Owen, and William Elam, Esqrs., were assigned by the court as counsel to appear for and defend him on his trial.

The counsel for the prisoner being called upon to announce whether he was ready for trial, moved for a continuance, and in support of their motion submitted an affidavit of the prisoner, setting forth that he was not ready to come to trial at that term ; that William Hammock was a material witness for him, and was absent without his consent or procurement ; that he had not been subpœnaed, because he was confined in jail, and his presence, therefore, expected ; that the showing was not made for delay, &c. ; that he expected to prove by Hammock that he saw the difficulty in which the deceased (Chambles) was said to have been killed ; that the deceased was pursuing the person who gave him the blow, and who said he did not intend to go any further ; that deceased came up with him, and

grabbed at him, when Hammock saw the blow given; that he expected, further, to prove by Hammock, that himself (the prisoner) and the deceased had been in company together during the evening of the day on which the deceased was killed, and that up to the time of the killing they had been perfectly friendly, without any previous difficulty, or cause of difficulty, between them. The motion for continuance being objected to on the part of the State, was overruled by the court below, and the counsel for the prisoner excepted. It appeared that Hammock had broken jail on the night preceding the term of the court.

The court below then ordered on the said issue to be tried, and caused to come a panel of forty-eight men as jurors. The array was then put upon the prisoner in the usual form; and there being no objection to the array, the court below caused the panel to be again called, one by one, in the order in which their names appeared upon the *venire facias*, and as numbered therein, commencing at number *one*, and continuing on to the name of Pulaski Posey, the seventh juror, who, on being called, was set down by the counsel for the State, until the remainder of the panel should be gone through with, and found insufficient to make a jury of twelve; it being claimed on the part of the State, that the State might by law pass by a juror, as a right, in addition to, and over and above, the ten peremptory challenges allowed by the Penal Code; and these last challenges were in no respect affected by such passing by of jurors. To all which the counsel for the prisoner objected. Whereupon the court below decided that the State might thus pass by the juror, Posey, until the remainder of the panel should be perused, without affecting her right to the ten challenges allowed by the code in such cases. The counsel for the prisoner excepted. The juror, Posey, was passed by, and the calling of the panel resumed. In the course of empanelling a jury, the counsel for the State, under the decision of the court, passed by divers other jurors, as in the case of the juror, Posey. A jury having been empanelled, divers witnesses were introduced, and sworn, on the part of the State, and amongst them William Miller, a lad thirteen years of age, who, after testifying at considerable length in behalf of the State, was asked, upon the cross-examination, by prisoner's counsel, whether he did not say to William Wynn and Fleming Freeman, or one of them, at Page's grocery, in Talbotton, since his examination before the committing magistrates in the case against the prisoner for the alleged murder, that the prisoner told the deceased, just before the stabbing, " I have run from you twice, and I shall not do it longer," whereupon the deceased grabbed at him, (prisoner,) and said, " I will cut your d——d windpipe?" and, in answer to said question, the witness, Miller, replied that he did not recollect having any such conversation with any one, and thought that he had never had any conversation with William Wynn about the matter at Page's store, or anywhere else. William Wynn was introduced, on behalf of the prisoner, with a view to discredit the witness Miller; and, after being sworn, was asked if William Miller had not at the time and place specified, and before Fleming Freeman and himself, made the representation referred to in the question put to him, Miller? The witness was stopped by the solicitor-general, and rejected by the court below, upon the ground that his testimony did not contradict Miller, whose denial was not positive, but to the best of his recollection merely. To which the counsel for the prisoner excepted.

The prisoner's counsel introduced John C. Maund as a witness, to impeach, collaterally, some of the witnesses on the part of the State, who had testified to the homicide taking place after dark, between seven and eight o'clock; that it was a tolerably dark night, but that they could distinguish, at the distance of ten paces on the public square at Talbotton, whether a man had on a white or a black hat or cap, and stated that there was but one person near the deceased when he was stabbed, and *that* person had on a black hat, and was a tall, spare-built, person, &c., (corresponding with the description of the prisoner.) Maund, and another, had experimented, between the same hours, of a similar star-light night, and satisfied themselves that objects could not be distinctly distinguished at the distance of ten steps. The testimony of Maund was objected to, and he was rejected by the court below. And the counsel for the prisoner excepted.

Hines Holt and Henry L. Benning, for the prisoner.

Levi B. Smith and E. H. Worrell, for the State.

*By the Court*—Lumpkin, Judge.

The prisoner was convicted of murder in the Superior Court of Talbot County, in March, 1846; and from the judgment then rendered against him he has appealed to this court. He complains of certain irregularities in the proceeding, and assigns for error, *first*, that the court refused to continue the case. It appears from the record, that after the arraignment, counsel for the prisoner moved a postponement of the trial, upon the ground that William Hammock, a material witness for him, was absent without his consent or procurement, and he rendered as an excuse why he had not been subpœnaed, that the witness was confined in jail, and his presence, *therefore*, expected.

The court declines expressing any opinion upon this exception, for the reason that the point cannot again arise on the *new trial*, which we feel constrained to award, on other grounds; and we dismiss this branch of the case with a single observation. The refusal of the court below to continue the indictment, could not be assigned as error but for the statute creating this court.—6 *Cranch's Rep.* 206. There is great danger of doing mischief by revising matters of this kind, which should properly be confided to the discretion of the court below, to be regulated by the circumstances of each particular case. No precise rule can be laid down, and a most arbitrary and oppressive exercise of this discretion must be made apparent to this court, before it will interfere.

Another error complained of by the prisoner, is, that Pulaski Posey, the seventh man on the jury list, being called, the court allowed the solicitor for the State *to pass him by*, until the remainder of the panel was gone through; and the same practice was preserved respecting other jurors.

Anciently, by the common law, any number of jurors might have been peremptorily challenged by the crown, without alleging any other reason for the objection than " *quod non boni sunt pro rege,*" that they were not good men for the king. But this power being found very liable to abuse,

and mischievous to the subject, tending to infinite delays and dangers, it was taken away by the 33 *Edw.* 1, *statutes* 4; commonly called *ordinatio de inquisitionibus.* By this it is enacted, *quod de cætero, licet pro domino rege dicatur, quod juratores,* &c., *non sunt boni pro rege ; non propter hoc remaneant inquisitiones,* &c. ; *sed assignes, certam causam calumniæ suæ,* &c.,whereby the king is now restrained.— *Thomas' Coke,* 474, *note n.* This ordinance of inquests directs, that when a juror was challenged for the king, the inquisition should not, therefore, remain untaken ; but those who sued for the king should show some cause of challenge, and the truth of such cause should be inquired of, according to the custom of the court ; after which, the inquisition should be proceeded in or not, according as the challenge was established or not.

In the construction of this statute, it is clearly settled, and is now the established practice of the courts, that if the king challenge a juror before the panel is *perused,* he need not show any cause of his challenge till the whole panel be gone through, and it appears that there will not be a full jury without the person so challenged ; and if the defendant, in order to oblige the king to show cause presently, challenge *touts paravaile,* yet it hath been adjudged that the defendant shall be first put, to show all his causes of challenge, before the king need to show any.— *Lord Raymond,* 473 ; *Skinner,* 82 ; 2 *Hale's His. P. C.* 271.

Challenges, in England, on behalf of the *defendant,* were either peremptory or for cause. The number which, in all cases of felony, the prisoner was allowed by the common law thus peremptorily to challenge, amounted to thirty-five, or one under the number of three full juries.— *Com. Dig. Challenge,* c. 1 ; 2 *Woodd.* 498, *Burnes on Juries,* 4. This number has been restricted to twenty of the jurors, in *murder,* by 32 *Hen.* 8, ch. 14, sec. 7.—4 *Black. Com.* 353.

The history of challenges, then, is briefly this: that originally, in Britain, the crown might challenge peremptorily any number of jurors ; that by the 33*d Edward 1st,* the king could not challenge *any juror, without cause* ; but that he was not bound to show cause, till all the panel was called over, and not then, unless, from challenge or otherwise, the jury is incomplete ; that the prisoner was entitled, at common law, to thirty-five capricious challenges, which number is reduced and limited by the 32*d Hen. 8th,* to *twenty,* in murder and other felonies. And now the important question for our consideration is, how have the rights of the State and its citizens been effected by the penal code of 1833 ?

By the 15th section and 14th divisions of that code, it is provided, "that every person indicted for a crime or offence, which may subject him or her, on conviction, to death, or four years imprisonment or longer in the penitentiary, may peremptorily challenge twenty of the jurors empaneled to try him or her. *And the State shall be allowed one half the number of peremptory challenges allowed the prisoner.*"—*Prince,* 660. Now, it will be perceived that under our code, the rights of the *defendant* are precisely the same as they were before ; while *ten peremptory* challenges are given to the State. Can it be believed that a code, professedly adopted to mitigate the rigor of the old law, intended to give this advantage to the State, *in addition* to the privilege which it already enjoyed, of setting aside any number of jurors, until the whole panel was exhausted ? The cotemporaneous interpretations of the statutes, by

almost all the circuits in the State, from the period of its passage, would negative this idea. The very language of the code, proves that the authors of it designed that the prisoners should enjoy double the advantage of the people in the trial. The State is entitled to one *half* the challenges allowed the accused. But this, with the privilege previously practised, in passing by jurors, is decidedly better than the *twenty* peremptory challenges allowed the defendant. The code itself professes " *to reform, amend,* and *consolidate* the penal laws of the State of Georgia." Nor are we at liberty to go out of it, or beyond or back of it, to ascertain the *mode* of trial or the relative rights of the parties. It dictates the question to be propounded to a juror on his *voire dire,* to test his competency, allowing to the State or the prisoner, if his answer is not satisfactory, the right to put such juror on his trial, *in the manner pointed out by law,* the code adopting the procedure at common law in this particular, and thus making it a part of itself. The *State* vs. *Benton,* ( 2 *Dev. and Battle, N. C.* 200,) is certainly an authority in support of the doctrines contended for in behalf of the prosecution: for by the act of the Legislature of that State, passed in 1827, *four,* instead of *ten,* peremptory challenges are given to the State. There is nothing, however, in this statute which indicates the intentions of the Legislature to adjust and fix the *relative rights* of the State and the prisoner. Nor does the act profess to *reform, amend,* and *consolidate* the penal laws of that State, in criminal cases. And with all possible deference for the distinguished judge who made that decision, one whose death was lamented throughout the Union, as a national calamity,(*a*) we must say, that the footing upon which the Supreme Court of North Carolina puts the law, would not justify us in following this precedent. " It may not be amiss," says the court, " to remark, that the practice of permitting the prosecuting officer to defer showing his cause of challenge to the excepted jurymen, until the panel be gone through, must be exercised under the supervision of the court, *who will restrain it, if applied to an unreasonable number.* On the trial of Horne Tooke, for treason, as many as seven, out of a panel of more than two hundred, were thus removed to the end of *the* panel; and this was not deemed an unreasonable number ; though, in consequence of the very many persons excused, it was in the end likely to produce a serious inconvenience to the prisoner, which was only prevented by the honorable conduct of the attorney-general." It need hardly be asked, shall a legal right, affecting vitally the life and liberty of our fellow-citizens, depend, in this State, either upon the discretion of the courts or the " *honorable conduct* " of the prosecuting officer ? We think not.

Justice in this way would not be meted out alike to all of our people. In the case under discussion, the record shows, that seven, out of the first panel of forty-eight, and nineteen, out of forty-one, or about one half of the next *tales* panel of the same number, were thus passed by the State. Was or was not this an unreasonable number ? It far exceeded the exercise of the privilege in Tooke's case.

After mature consultation, then, on this alleged irregularity, so deeply concerning the purity of trial by jury, and the rights of defendants, the court agree that the exception is well founded.

(*a*) Hon. WILLIAM GASTON.

The *third* error relied upon by the prisoner for the reversal of this judgment, and which, like the one just disposed of, has been argued, with great ingenuity by counsel on both sides, is the rejection of certain testimony tendered by the defendant in the progress of the trial.

William Miller, a lad of thirteen years of age, was introduced among other witnesses in behalf of the State. He was asked, upon the cross-examination, by prisoner's counsel, whether he had not, at a certain time and place, and in the presence and hearing of certain persons, naming them, made statements which were recapitulated to the witness, and materially different from his present testimony ? He answered, " *that he did not remember* to have told William Wynn, (one of the individuals designated,) but thinks he never had any conversation with him about the matter, at Page's grocery or any where else." William Wynn was then introduced, and after being sworn, asked if Miller had not, at the time and place specified, and before Fleming Freeman and himself, made the representations referred to in the interrogatory put to him. The witness was stopped by the solicitor, and rejected by the court, upon the ground, that his testimony did not contradict Miller, whose denial was not positive and absolute, but to the best of his recollection merely.

The rule of evidence, as now understood, appears to be, that before the credit of a witness can be impeached, by proof, that he has made statements out of the court contrary to what he has testified at the trial, that it is necessary first to inquire of the witness himself as to the time, place, and person, involved in the supposed contradiction. Such was the unanimous opinion of the learned judges, as delivered by Chief Justice Abbott, in the Queen's case.—2 *Brod.* and *Bing.* 313, 314; 1 *Moody Malkin,* 473. In this country the same course is understood to be pretty generally adopted.—1 *Green. Ev.* 516, *notes.*

In some of the States the rule is strenuously resisted, as an innovation upon the law. And in *Tucker* vs. *Welsh,* (17 *Mass. Rep.* 166,) Parker, C. J., says : that the practice in that State, ever since it can be remembered, has been otherwise, and that if the principal witness is present, he is called upon to attend ; and he then has an opportunity, after it has been shown that he had made different statements, out of court, to explain or deny. If he denies them, the credibility of the opposing testimony, is to be decided by the jury. He asserts that, no lawyer in that commonwealth can recollect an instance of an impeaching witness being stopped, until the other was called up, and asked, whether he had had any conversation with the person about to impeach him, and was reminded of that conversation.

He insists that the practice adopted by the British House of Lords, on the trial of Queen Caroline, has never been adopted in this country, and *seems not to have been very familiar there;* otherwise it would hardly have been necessary to have taken the solemn opinion of all the judges of the Court of King's Bench upon the question.

The learned judge moreover suggests that the utility of the practice is not very obvious. That witnesses about to be impeached are, generally, persons of a doubtful or unknown character ; and the wisdom of putting them upon their guard, and enabling them to forestall an answer to the opposing witness, is not very discernable. Phillips lays down no such rule of evidence ; on the contrary, he expressly states, that a wit-

ness may be impeached, by proving that he had given a different account of the thing; and a letter, written by him, to this effect, may be used against his testimony, and this without asking him upon the stand whether he had written such a letter, and what were the contents of it. And *Peake* states, that declarations made by a witness, on the same subject, contrary to what he swears on the trial, may be given in evidence to impeach his credit, and no qualification of this doctrine is laid down.

The foregoing views are not without weight. It is not necessary, however, in the present case, to decide between them and the utility and convenience of the rule, as settled in the Queen's case.

Here the witness was asked, upon cross-examination, whether or not he had said, or declared, that which was intended to be proved. His answer was that he did not remember, but that he did not think that he ever had made the statements imputed to him. Can he be contradicted? There is a dictum in *Roscoe on Criminal Evidence*, (page 171,) citing *Paine* vs. *Reeston*, (1 *Moo.* and *Rob.* 20,) to this effect: " Where the witness merely says that he does not recollect making the statements, evidence to prove that he did, in fact, make the statements, is inadmissible; there must be an express denial." We cannot recognize this proposition as sound law.

In *Crowley* vs. *Page*, (7 *Carrington and Payne*, 792,) this point came directly before the court. The answer of the witness there was, *that he did not recollect* making the statements. Talfourd, sergt., proposed to call John Burton, to prove that William Beard had said that the hay was of good quality. Ludlow, the opposing counsel, remarked it could not be done, as Beard *did not deny* having said so. Parker, Baron: " He did not admit and he did not deny it. Evidence of statements by witnesses on other occasions, relevant to the matter at issue, and inconsistent with the testimony given by them on the trial, is always admissable, in order to impeach the value of that testimony; but it is only such statements as are relevant, that are admissable; and in order to lay a foundation for the admission of such contradictory statements, and to enable the witness to explain them, and as I conceive for that purpose only; the witness may be asked whether he ever said what is suggested to him, with the name of the persons to whom or in whose presence he is supposed to have said it, or some other circumstance sufficient to designate the particular occasion. If the witness, on the cross-examination, admits the conversation imputed to him, there is no necessity of giving other evidence of it; but if he says he does not recollect, that is not an admission, and you may give evidence on the other side to prove that the witness did say what is imputed, always supposing the statement to be relevant to the matter at issue. This has always been my practice, and if it were not so, you could never contradict a witness who said *he could not remember*."

We believe the true rule to be here stated, and that upon every consideration of reason, public policy and authority, the evidence should have been admitted. If the witness has honestly forgotten what he did say, it ought to be permitted to show his early and fresher recollections of the matter, which is likely to have been more accurate. Besides, should he even deny positively ever having made the declaration, it is nothing more after all than saying that he did not recollect to have done so. For

his asseverations, however absolute, must rest upon the fidelity of his memory.    But the main argument in favor of the reception of the testimony is founded upon the strong temptations in pliable witnesses to screen themselves from contradictions, under this evasive form of answering.— See *Stahle* vs. *Spohn*, 8 *Serg. and Rawle*, 307 ; *Everson* vs. *Carpenter*, 17 *Wend. Rep.* 419.    It is finally argued by prisoner's counsel, that the court erred in refusing the testimony of John C. Maund, who was offered to impeach collaterally some of the witnesses on the part of the State, who had testified to the homicide, by showing that he had experimented, in company with another individual, between the same hours of a similar star-light night, and satisfied himself that objects could not be distinctly discerned at the distance the witnesses were situated from the parties. We are of the opinion that this evidence was properly repelled.    The difference in men's visions, and the uncertainty as to the exact quantity of light on both nights, would render the proof too uncertain to be relied on.    Moreover, the record shows that there was light, and reflected occasionally upon the scene of this tragedy, from some of the surrounding houses.

Upon the second and third grounds, then, the judgment must be reversed, and the cause remanded.