JAMES F. MATHIS, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. The act of 1889, Chapter 3905, entitled an act to provide for the revision and consolidation of the public statutes of this State, did not invest the Commissioners of themselves with power to enact any new statutory law, or to revive any statute or statutes not in force at the time of the revision. The duty of the Commissioners under this act was to revise, simplify, arrange and consolidate the public statutes then in force into one body, or into the form of one act under titles, chapters and subdivisions, with side-notes to indicate the contents of the original text, with references to show from what act each section was compiled, and to the decisions of the court construing the the statutes; and they were also authorized and directed to report to the Legislature along with the submission of the printed copy of the revision, such contradictions, omissions and imperfections as may appear in the original text of said acts, and

the mode in which they shall have reconciled, supplied and amended the same ; and they were further directed to designate such acts or parts of acts as in their judgment ought to be repealed, with the reason for the same, and also recommend the passage of such new acts as may appear necessary or expedient, either in lieu of, or in addition to, any of the acts so revised and consolidated. The entire work of the Commissioners was to be submitted to, and be reviewed by the Legislature, and be re-enacted by that body, if it should so determine.

2. The statutes in force in this State at the time of the revision derived their binding force from the prior action of the Legislature, independent of the act of 1889, under which the revision was made, but such new matter as was submitted by the Commissioners with the consolidation of the already existing statutes must derive its power as statutory law from the sanction of the Legislature, in the form of a constitutional enactment.

3. The provision in the Revised Statutes that an accused in a capital case shall be entitled to only ten peremptory challenges, is new matter contained therein, as the statute in existence at the time of the revision in such cases secured to him twenty such challenges, and it has not been taken away otherwise than by the revision.

4. By the act of 1891, Chapter 4055, the Revised Statutes mentioned therein as accompanying the same were constitutionally enacted as statute law of a general and public nature, under the title of the Revised Statutes of the State of Florida, although they were not bodily incorporated in said act.

5. The essential requirements of the Constitution, that there must be a bill with an enacting clause and a title embracing but one subject, and matter properly connected therewith, and that it must pass both branches of the Legislature in the mode prescribed for the enactment of laws, and signed by the proper officers of the Legislature; *Held*, Sufficiently complied with in the passage of Chapter 4055, adopting the Revised Statutes.

6. Whenever it is acting in the apparent performance of legal functions, every reasonable presumption is to be made in favor of

the action of the legislative body, and it will not be presumed in any case, from the mere silence of the journals, that either House has exceeded its authority, or disregarded a constitutional requirement in the passage of laws, except where the Constitution has expressly required the journals to affirmatively show the action of the Legislature.

7. The journals of the two Houses of the Legislature examined; and held, that all the proceedings required by the Constitution to affirmatively appear upon the journals in reference to enacting laws, are properly recorded in the passage of Chapter 4055, Laws of Florida.

8. The right to peremptorily challenge jurors appertains to the remedy or procedure under which prosecutions are conducted, and not to the essence of the offense itself. The Legislature can, at any time, change the law in this respect, and such change will apply to prosecutions of offenses committed before, as well as those committed after the change has been made.

9. The provision in Section 32, Article III, Constitution of 1885, that "the repeal or amendment of any criminal statute shall not affect the prosecution or punishment of any crime committed before such repeal or amendment," relates to the offense itself or the punishment thereof, and not to the remedy or procedure which the Legislature may enact for the prosecution and punishment, unless the change in the remedy should affect in some way the substantial rights of defense.

10. The right to peremptorily challenge jurors does not exist, or does not accrue to an accused, until trial; and the third section of the act adopting the Revision, providing that "the repeal of any statute by said Revision shall not affect any right accrued before such repeal," does not have the effect to save an accused the right to twenty peremptory challenges on a prosecution for a capital offense, alleged to have been committed before the Revised Statutes became operative, but when the trial occurs thereafter.

11. After four jurors had been examined, sworn and accepted by the State and the accused, and the regular and a special venire had been exhausted, the State objected to the last juror sworn

from the special venire on the ground that he was present at the inquest held by the coroner over the body of the deceased, and heard the evidence of witnesses given there, and that this fact, shown by affidavits then in possession of the State Attorney and offered to the court, was not known when the juror was tendered and accepted. Without passing upon the objection raised by the State to the juror, and on motion of the State Attorney, the judge ordered that the juror be taken from the jury box, and that his name be placed at the foot of the list of a third venire of jurors summoned, against the objection of the accused. The jury was completed from the list before reaching the juror taken from the box, and after the accused had exhausted all of his peremptory challenges: *Held*, That it was error for the judge, without passing upon the objections raised to the juror, to stand him aside on the motion of the State, and proceed with the organization of the jury.

Writ of error to the Circuit Court for Hamilton County.

The facts in the case are stated in the opinion of the court.

*B. B. Blackwell* for Plaintiff in Error.

*The Attorney-General* for Defendant in Error.

MABRY, J.:

In February, A. D. 1892, an indictment for murder in the first degree was presented against the plaintiff in error in the Circuit Court for Hamilton county, and in August of that year he was convicted, on this indictment, of murder in the first degree with a recommendation of mercy to the court. From this judgment entered against him in the Circuit Court the accused

has obtained a writ of error, and upon the record brought here has filed the following assignment of errors, *viz*:

1st. The court erred in overruling defendant's challenge to the array of jurors drawn by special order of court.

2nd. The court erred in overruling defendant's motion for a new trial, on the ground that W. J. Nelson, a juror, had changed his place of residence, and was not a qualified juror.

3rd. The court erred in refusing to allow defendant more than ten peremptory challenges.

4th. The court erred in withdrawing Goleman, a juror, from the jury box and discharging him after he was sworn, and after the panel was complete.

5th. The court erred in swearing the 13th juror, Cheshire, without first disposing of the State's motion to discharge Goleman.

6th. The court erred in overruling defendant's peremptory challenge to the juror Cheshire.

It appears from the bill of exceptions that before commencing to  empanel the jury, the judge announced to the defendant's counsel that the defense would be allowed only ten peremptory challenges, and that counsel for the defense stated to the court that the defendant would insist on twenty.   It is further made to appear that after eleven jurors, besides N. J. Goleman,  who had  been  directed by the court to leave the jury box in charge of a bailiff pending an ex-

amination as to his qualification, had been selected, Walter Cheshire was called from the list of talismen and tendered as a juror by the State to the defendant, and thereupon the defendant challenged this juror peremptorily, but the court overruled this challenge on the ground then stated, that the defendant had already challenged ten jurors and was not entitled to challenge peremptorily any more. To this ruling the defendant excepted.

The third and sixth assignments of error may be considered together as they involve the same point. The indictment in this case was presented before the Revised Statutes went into effect, and the trial took place thereafter. Under the statute in force prior to the adoption of the Revised Statutes an accused on trial for a capital offense was entitled to twenty peremptory challenges, but the Revision gives him only ten.

The objection here presented, is that the change in reference to the number of peremptory challenges allowed an accused in a capital case and found only in the Revised Statutes has not been constitutionally enacted as law in this State.

It is contended by counsel for plaintiff in error, that the Commissioners appointed to revise the statutes had no authority to make such a radical change in the law as they have done in this instance, and that the power given to "revise, simplify, arrange and consolidate" the statutes referred to in the act of 1889, Chapter 3905, did not authorize them to make a new

law or to repeal one then in existence. This objection is followed by the further contention that the change in reference to peremptory challenges in capital cases has not been constitutionally enacted by the Legislature.

It is perfectly clear that the act of 1889 did not undertake to invest the Commissioners of themselves with any power to enact any new statutory law, or to revive any statute or statutes not in force at the time of the revision. The power to "revise, simplify, arrange and consolidate" conferred by this statute, contemplated no such authority in the Commissioners as that of creating new laws. The proviso to the first section shows that even in the matter of phraseology the Commissioners were directed to make no changes in reference to statutes that had been judicially construed, to such an extent as to impair or affect the construction thereof. The manifest purpose of the first section of this act is that the Commissioners to be appointed by the Governor should have authority, and it was made their duty, to revise, simplify, arrange and consolidate the public statutes mentioned in the section, and in force in this State at the time of the revision and at the time of their report, as provided in the second section of the act. In the performance of this duty the Commissioners were directed to reduce the various statutes mentioned into one body, or into the form of one act under titles, chapters and sub-divisions, with the side notes to indicate the contents of the original text, with references thereto to show from

what act each section was compiled, and also to the decisions of the court construing the statutes. In the consolidation, arrangement and distribution of the various statutes into sections and sub-divisions, the Commissioners were invested with a wide discretion. They were to exercise their judgement in such matters. But the work of the Commissioners under the statute did not stop with the revision, arrangement and consolidation of the statutes mentioned in the first section of the act then in force. By the second section they were required to lay before the Legislature at the next regular session a printed copy of the public acts so revised and consolidated by them, and at the same time they were required to suggest to the Legislature "such contradictions, omissions and imperfections as may appear in the original text of said acts, and the mode in which they shall have reconciled, supplied and amended the same; and they may also designate such acts or parts of acts as, in their judgment, ought to be repealed, with their reason for advising such repeal, and may also recommend the passage of such new acts or parts of acts as, in their judgment, may appear necessary or expedient, either in lieu of or in addition to any of the acts so revised and consolidated." The entire work, according to the clear meaning of the act, was to pass under review by the Legislature and to be re-enacted by that body if it should so determine.

Taking the two sections of this act together it becomes evident that in the submission of the consolidated body of statutory law to the Legislature for

approval, the Commissioners were not confined entirely to the then existing mass of statutory laws in force in this State, but were authorized to submit and recommend such omissions therein and additions thereto as in their judgment were necessary to render the revision complete and perfect as an entire system. The language in the second section that they "shall suggest to the Legislature such contradictions, omissions and imperfections as may appear in the original text of said acts and the mode in which they shall have reconciled, supplied and amended the same," can not be held to confer upon the Commissioners of themselves the power to make such omissions or additions to the existing statutes as might be submitted of any binding force independent of the sanction of the Legislature. This could not have been done if the Legislature had so intended. The portion of the consolidated statutes that was in force at the time of the revision derived its binding power from the act of the Legislature, independent of the statute of 1889 under which the revision was made, but such new matter as might be submitted by the Commissioners with the consolidation of the already existing statutes can have no force as law unless it has received the sanction of the Legislature in the form of a constitutional enactment. The curtailment of the right of an accused in a capital case to ten peremptory challenges is new matter, as the statute in existence at the time of the revision in such cases secured to him twenty such challenges, and it has not been taken away otherwise than by the Revised Statutes.

In the report of the Commissioners submitted to the
Legislature with the printed copy of the Revised Stat-
utes, they noted changes and alterations made by them,
and the change in reference to the number of per-
emptory challenges in capital cases is specially men-
tioned. House Journal, 1891, pages 635, 636 and 637.
The fact, however, that the Commissioners have incor-
porated this new provision in reference to peremptory
challenges into the revision of the statutes is not of it-
self sufficient to render it nugatory, provided the Leg-
islature has given to it the sanction of law enacted in
a constitutional way. This the Legislature has under-
taken to do, as will further appear.

The second contention of counsel is, that the Re-
vised Statutes have not been constitutionally enacted
by the Legislature, and hence the change in reference
to the number of peremptory challenges attempted to
be incorporated therein is inoperative.

It is insisted that by virtue of Article III, Sections
15, 16 and 17, Constitution of 1885, it is essential to
any legislative enactment that there be a bill with an
enacting clause, and a title embracing but one subject
and matter properly connected therewith ; that the
bill must be passed or enacted, and as a badge of iden-
tity and authenticity, it must be signed by the proper
officers of the two branches of the Legislature. Or to
state the objection in another form, that before any
proposition can become a law it must be embodied
into a bill with an enacting clause and a title, and must
be passed in the constitutional mode prescribed for
the enacting of laws generally. That this has not

been done in reference to the adoption of the Revised Statutes, and further, that there is nothing to indentify them as the revision that did pass the Legislature.

It is conceded that in the 17th section of the article above referred to, the authority for a general revision of the statutory laws of this State is recognized, but it is maintained that this authority goes no further than to dispense with the reading of the revision by sections on its final passage, and that all other requirements of the Constitution relative to general legislation must be complied with in the adoption of the Revised Statutes. We think it is true that all the formalities required by the Constitution to be observed in general legislation are necessary in the enactment of a general revision of the entire laws, except as is, expressly provided by the Constitution that "any general revision of the entire laws embodied in any bill shall not be required to be read by sections upon its final passage, and its reading may be wholly dispensed with by a two-thirds vote."

The act of the Legislature adopting the Revised Statutes did not incorporate them bodily therein, but referred to them as accompanying the act. Can this be done? Mr. Cushing, in his book on the law and practice of legislative assemblies, Section 2055, says: "A bill is a proposition, or series of propositions, expressed in a particular form of words purporting to be an authoritative declaration of the will of the legislative power; and which, when agreed to by the

different branches of that power, becomes a law. The effecting of this agreement is what is meant by the passing of a bill ; and the form in which the proceedings are conducted, with a view to this end, constitute the system or method of passing bills in a legislative assembly.'' It is true, as contended for by counsel for plaintiff in error, that there are certain constitutional requirements in reference to the enactment of laws which must be complied with, and their disregard will be fatal to any effort at legislation. Every act in this State must have the enacting clause provided by the Constitution, as indicating its source of authority, and each law must embrace but one subject and matter properly connected therewith, and this subject must be briefly expressed in the title. The bill, during its passage through the two Houses, is required to be read by sections on three several days in each House, unless when on its first and second readings this requirement in case of emergency is dispensed with by a two-thirds vote in the House where it is pending; but its reading by sections shall in no case be dispensed with on its third reading, except in the case of the adoption of the Revised Statutes embodied in any bill as above mentioned. The bill, when passed by both Houses, must also be signed by the presiding officers of the respective Houses, and the Secretary of the Senate and the Clerk of the House of Representatives. It is also a constitutional requirement that each House shall keep a journal of its own proceed-

ings, which shall be published, and the vote on the final passage of every bill shall be taken by yeas and nays and entered on the journal of each House.

It is stated by Mr. Cooley in his work on Constitutional Limitations, page 163, that "if it should appear from these journals that any act did not secure the requisite majority, or that in respect to it the Legislature did not follow any requirement of the Constitution, or that in any other respect the act was not constitutionally adopted, the courts may act upon this evidence, and adjudge the statute void. But whenever it is acting on the apparent performance of legal functions, every reasonable presumption is to be made in favor of the action of a legislative body; it will not be presumed in any case, from the mere silence of the journals, that either house has exceeded its authority, or disregarded a constitutional requirement in the passage of legislative acts, unless where the Constitution has expressly required the journals to show the action taken, as, for instance, where it requires the yeas and nays to be entered." There is a decided conflict of authority on this point, several American courts holding that neither the journals kept by the Legislature, nor the bill as originally introduced, nor the amendments attached thereto can be received in order to show that an act of the Legislature properly enrolled, authenticated and deposited with the Secretary of State, did not become a law. State ex rel. vs. Swift, 10 Nev., 176, and authorities cited. Our court,

however, has adopted the view expressed by Judge Cooley. State *ex rel.* vs. Brown, 20 Fla., 407; State *ex rel.* vs. Deal, 24 Fla., 293. Looking to the journals kept by the two houses of the Legislature, we find that the work of the Commissioners in revising and consolidating the statutes under the act of 1889, was submitted to the Legislature and was examined and considered by that body, and was reported for adoption with amendments. House Journal, pages 635 and 916. We also find that "House bill No. 358: To be entitled an act to enact the Revised Statutes of the State of Florida, and to provide for the printing, sale and distribution thereof," was introduced for the purpose of adopting the Revised Statutes, and that this bill after being amended in some particulars was regularly passed through both branches of the Legislature. Without setting out here the various stages of progress of this bill through the two houses. it is sufficient to say that all the proceedings in reference thereto required to affirmatively appear on the journals are there recorded. This bill was read upon its final passage in each house, and as a matter of fact there is nothing to show that the Revised Statutes accompanying the bill were not also read. Among the enrolled bills signed by the presiding officers of the respective houses, the Secretary of the Senate, and Clerk of the House, and approved by the Governor, we find an exact copy of Chapter 4055 of the printed laws of 1891. The first section of this act provides "that the accompanying general re-

vision of the public statutes of Florida, of a general
and permanent nature, revised and reported by the
Commissioners under an act entitled an act to provide
for the revision and consolidation of the public stat-
utes of this State, be, with the omissions, alterations
and additions, from, of and to the same, set forth in
Sections 5, 6 and 7, and the same is hereby enacted as
statute law under the title of the Revised Statutes of
the State of Florida.'' There accompanied the en-
rolled bill to the office of the Secretary of State a draft
of the Revised Statutes, in sections, with the names
of the President of the Senate, Speaker of the House
of Representatives and Governor signed officially
thereon, and such draft is now on file in the office of
the Secretary of State. The objection that there is
nothing to identify the Revised Statutes as being those
that were before the Legislature and referred to in the
act passed to put them in force, can not prevail. In
addition to the fact that the journals show that the
draft of the Revised Statutes prepared by the Com-
missioners was before the Legislature at the time of
the passage of Chapter 4055, and the further fact that
it accompanied the enrolled bill into the office of the
Secretary of State, it also appears that the adopting
act made various references to the revision in the way
of eliminating by amendment parts thereof and mak-
ing additions thereto. The necessary record evidence
to identify the Revised Statutes as those intended to

20)

be adopted and that were adopted by the Legislature, is ample, and there is no room for serious doubt on this point. The objection does not extend to the publication of the revision, and hence it is not necessary to say anything in reference to the manner in which the statutes were printed and promulgated after their adoption by the Legislature.

The contention of counsel does, however, go to the extent of questioning the validity of the enactment of the Revised Statutes, because they were not bodily incorporated into the bill adopting them, and were enacted only by a reference to them.

We are unable to discover any serious difficulty in reference to the manner in which the Revised Statutes were adopted, and we may say that such an enactment of laws is not entirely new in this State. The statutes of 1829 and 1832, adopting the common and statute laws of England of a general nature with the exceptions mentioned, did not incorporate bodily such laws and statutes in the bill adopting them, and still by virtue of such legislation they had the effect of laws in this State. The Code of Procedure adopted in this State in 1870 was repealed in 1873. Chapter 1938. The first section of this repealing act abolished entirely the Code, and the second section provided "that all laws, practice, pleadings, rules and proceedings existing in this State at the time of the passage of the act mentioned in the foregoing section, which were re-

pealed or supplied by the same, be and the same are hereby revived, except where they conflict with the provisions of this act.''

The laws, practice, pleadings, rules and proceedings in existence at the time of the enactment of the Code and thereby superseded were not set out in the bill reviving them, yet it has never been questioned that all such were revived and have been so acted upon ever since. The Constitution under which this act was passed is essentially the same in reference to the passage of laws as that of 1885, except as to the provision about reading the Revised Statutes on their final passage.

A loan association had become incorporated by the Inferior Court of Bibb county under an act of the Legislature of the State of Georgia, and the Legislature of that state passed a confirmatory act declaring certain parties named, their successors and assigns to be a body politic and corporate under and according to the constitution and by-laws already adopted by them, and that all the transactions of the association had by and with the members thereof while acting under their former incorporation were declared to be valid and binding in law. The objection made to this act in the case of Bibb County Loan Association vs. Richards, 21 Ga., 592, was that inasmuch as the constitution and by-laws of the association are not embodied in the act, but adopted by reference merely, that they were not read three times, and on three separate days, in

each branch of the Legislature, before the act was passed as required by the Constitution of the state, and hence the act was void. There was nothing to show that the act that did pass was not read as required by the Constitution and that the constitution and by-laws of the loan association were not also read simultaneously with the statute, but they did not appear to be embodied in the act adopting them. The court held that the Legislature could adopt the constitution and by-laws of the associaton by reference to them, and that the maxim *Id certum est quod certum reddi potest,* was applicable alike to statutes as to contracts, wills, judgments, deeds and other acts of men. Judge Lumpkin in his opinion in this case gives some illustrations, he says: "Suppose the Legislature were to adopt the Bible as a part of the law of the land, would the act be void, unless the whole of the old and new Testaments were embodied in the statute? Suppose it were to declare that the levitical decrees as set forth in the old Testament should fix the relationship within which marriage might or might not be contracted, or suppose it were to say, that Mr. Greenleaf's Treatise on Evidence should be the guide of the courts in settling the rules of testimony. It is needless to multiply illustrations." He further says that to "set aside this charter and you eviscerate the digests and statute books of the state." *Vide* also Pulford vs. Fire Department of Detroit, 31 Mich., 458.

Still more directly in point is the case of Dew vs. Cunningham, 28 Ala., 466. In this case it was contended that the Code of statutory laws then recently

adopted by the Legislature was not in force because at the time of its adoption it was not read upon three several days in each house of the General Assembly, and that it had not the style required by the Legislature.   The Constitution then in force in that state provided that "no bill shall have the force of law, until on three several days it be read in each house and free discussion had thereon," and the style of all laws shall be, "Be it enacted by the Senate and House of Representatives of the State of Alabama, in general assembly convened."   The Code was held in this case to have been constitutionally enacted although not embodied in the bill adopting it.   Walker, Judge, said in the opinion : "We do not understand this to mean that everything which is to become a law by the adoption of the bill must be read on three several days.   Such a construction is not warranted by the language of the Constitution,   Our legislative annals afford many instances of the adoption, by one comprehensive enactment, of large masses of law, which were never read on three several days in both branches of the Legislature.   To this class of legislation belongs the statute which provides for the punishment, as at common law, of misdemeanors, for which no punishment is prescribed in our statutes."   And as to the objection in reference to the style he says : "Conceding for the sake of argument, that the adoption of the style is necessary to the validity of an act of the Legislature, it will not aid the appellants.   The bill adopting the Code is pre-

ceded by the words designating the style of the laws and that is sufficient. It would be impracticable to make the style precede every law called into force by an act of the Legislature. ⸤ The style which heads the bill adopting the Code will be regarded as the style of the laws embraced in it.''

Without further discussion on this point we announce our conclusion that the Revised Statutes were constitutionally adopted by the act of 1891, Chapter 4055, and the matter therein contained from the time the statutes went into effect, June 13th, 1891, became the statutory laws of a general nature in force in this State.

It is further contended that under the third section of the adopting act, which is that ''the repeal of any statute by said revision shall not affect any right accrued before such repeal,'' the right to twenty peremptory challenges given an accused under the old law has been saved in the trial for offenses committed before the revision took effect. The words, ''right accrued,'' it is maintained, were used instead of vested right, to indicate a purpose on the part of the Legislature to save a class of minor rights not embraced in the latter, and that the right of twenty peremptory challenges accorded to the accused under the old law is included in the former provision. This contention, we think, is not correct. Section 32, Article III, Constitution of 1885, has no application to the change of the law in reference to the number of peremptory challenges allowed in a capital case. The provision of

this section that "the repeal or amendment of any criminal statute shall not affect the prosecution or punishment of any crime committed before such repeal or amendment," relates to the offense itself or the punishment thereof, and not to the remedy or procedure which the Legislature may enact for the prosecution and punishment of offenses, unless the change in the remedy should affect in some way the substantial rights of defense. The history of this section, as explained in *Ex parte* Pells, 28 Fla., 67, 9 South. Rep., 833, shows that the Constitution framers designed thereby to guard against the liberation of offenders without trial by the repeal of statutes under which offenses may have been committed. Section 2353 of the Revised Statutes provides that "no offense committed and no penalty or forfeiture incurred prior to the taking effect of these Revised Statutes, shall be affected thereby, and no prosecution had or commenced, shall be abated thereby, except that when any punishment, forfeiture or penalty shall have been mitigated by the provisions of these Revised Statutes, such provisions shall apply to and control any judgment or sentence to be pronounced, and all prosecutions shall be conducted according to the provisions of law in force at the time of such further prosecution and trial applicable to the case." Here is a positive legislative declaration contained in the Revised Statutes adopted by the act of 1891, that all prosecutions shall be conducted according to the law in force at the time of trial, that is, that the remedy then in force shall be applied.

It is entirely clear that the right to peremptory challenges appertains to the remedy, the procedure under which prosecutions are conducted, and not to the essence of the offense itself. The Legislature can at any time change the law in this respect, and such change will apply to prosecutions of offenses committed before as well as those committed after the change has been made. Such legislation is not *ex post facto*. Cooley's Con. Lim., 329; Bishop on Statutory Crimes, section 178; Thompson & Merriam on Juries, section 165; People vs. Mortimer, 46 Cal., 114; State vs. Ryan, 13 Minn., 370.

The third section in the adopting act, which must be construed in connection with the provisions of the Revised Statutes, does not, in our judgment, prevent the operation of Section 2353, so far as the remedy is concerned, to the trial of this case. No right of peremptory challenge at all had accrued to the accused up to the time he was put on trial, and hence at the time of the change of the law in reference to such challenges, no right had accrued to him in this respect.

It appears that after one juror had been obtained from the regular panel in attendance upon the court, an order was made for twelve additional jurors to be drawn from the box, and that the drawing of ten names under this order exhausted the box. A venire for the ten names drawn was issued, and upon its return executed, three additional jurors were obtained,

and the defendant had made five peremptory challenges. N. J. Goleman was the last name drawn from the box, and was the last name of the ten on this venire. This juror was examined on his *voir dire*, accepted and sworn as a juror. A further venire for fifty jurors to be summoned from the body of the county at large was issued, and before proceeding to select the remaining jurors from this list, the State Attorney moved the court to exclude N. J. Goleman from the jury box, and stated to the court that the State was in possession of affidavits showing that this juror was present at the inquest held by the coroner over the deceased, and that this fact was not known to the State when the juror was tendered and accepted. The State Attorney also asked that this juror be re-sworn to answer questions so that the State might interrogate him in reference to this matter. The defendant objected. The ruling of the court on this request is as follows: "If he answered the questions yesterday, that is sufficient. He has been asked the questions in the usual form, and stated that he had no fixed opinion to prevent him from finding a verdict readily contrary to the opinion he has formed. What is the use of re-swearing him?" Upon further request on the part of the State Attorney to call the attention of the juror to the point raised in the affidavit, the judge ruled that it was not proper to re-swear the juror, but that he would hear the affidavit. The defendant excepted. Affidavits were then read to the court. These affidavits, in sub-

stance, state that the juror, Goleman, was present at the coroner's inquest and heard the evidence of witnesses there given. The State Attorney states in an affidavit made by him that this juror answered on his *voir dire* that he had formed an opinion upon rumor as to the guilt or innocence of the accused, but notwithstanding such opinion he could readily find a verdict from the evidence in the case, although different from the opinion he had formed. Thereupon the court directed this juror to be withdrawn from the box and put at the foot of the list of veniremen summoned from the county, and also that he be put in charge of a bailiff until it could be ascertained whether or not a jury without objection could be obtained from the talismen in attendance. The court also stated that if the jury could not be obtained, and after an investigation, the mind of the court was clear, the juror might be permitted to come back to the box. The defendant refused to proceed until the court finally settled whether this juror should remain on the panel, and the court ruled that defendant should proceed, to which ruling defendant excepted. The jury was then selected from the special venire, but when the eleventh man, in addition to N. J. Goleman, who had been taken from the box and put at the foot of the list, had been obtained, and the defendant had exhausted all of his peremptory challenges, further objection was made on the part of the defense to selecting another juror, on the ground that the panel was full, and no

disposition had been made of the juror, Goleman. This objection was overruled, and another juror, Walter Cheshire, was called and tendered to the defendant, who first offered to challenge peremptorily this juror, and upon this being overruled, objected to his being sworn because the panel was full. The court permitted the juror Cheshire to be sworn, and the panel in the box then being full, Goleman was called up and discharged. The ruling of the court in full on the foregoing objections is set out in the bill of exceptions, and it is as follows : "Affidavits having been filed, as shown in the record, stating that the fourth juryman chosen and sworn had heard the evidence on the coroner's inquest, by witnesses deposing as to the fact of the killing, upon motion of the State Attorney that said juryman be withdrawn and put at the foot of the list, leaving only three jurors in the box, with forty talismen in attendance, upon consideration he was ordered to stand aside until we could ascertain whether we could get a jury that was without objection, and having obtained a jury from the talismen in attendance, he was discharged by order of the court."

The fourth and fifth assignments of error are based upon the foregoing state of the record. We do not know what the views of the court were in reference to the competency of the juror Goleman, further than the intimation in the ruling on the application to re-examine this juror, that "he had been asked the questions in the usual form and stated that he had no fixed

opinion to prevent him from finding readily contrary to the opinion he had formed." It is true that the court made this ruling before hearing the affidavits, but after this there was no ruling that the juror was incompetent. According to the language of the court announcing its decision the juror was ordered to stand aside until it could be ascertained whether or not a jury without objection could be obtained. If the court desired additional information in reference to this juror's qualifications, we can see no valid objection to a further examination upon competent proof into this matter, made at the time the objection is presented, even if the juror had been accepted and sworn. Metzger vs. State, 18 Fla., 481. But the court, in the case before us, did not rule upon the competency of the juror, nor did it undertake to excuse him until after the panel was complete. Without passing upon the objection to the juror presented by the State, the court ordered him to stand aside until it could be ascertained if a jury without objection could be secured from the talismen in attendance upon the court. The juror ordered to stand aside was the last juror on the special venire of ten, and his name was placed at the foot of the list of a further venire of fifty persons. If the State had the right to have one juror stand aside and proceed with the list, of course any number can be required to stand aside until the entire list is perused. To sustain the ruling of the court in the present case would sanction this right.

Originally at common law the crown had an unlimited number of peremptory challenges, and in any

criminal case might, by exercising this right, indefin-
itely postpone the trial *pro defectu juratorum.* Dur-
ing the reign of Edw. I, a statute was passed depriv-
ing the King of the right to any challenges except for
cause, but under this statute the practice obtained not
to compel the crown to show cause against a juror at
the time of his challenge but he was directed by the
court to stand aside until the entire panel was gone
over, or until enough jurors without objection had
been found to make out the requisite number. The
defendant was required to challenge or accept the
qualified jurors tendered him, and if, after exhausting
his peremptory challenges, a sufficient number of per-
sons remaining on the list could be procured that were
unobjectionable, these were selected, but in case of de-
ficiency the crown was then required to show
cause in respect to those jurors who had been
directed to stand aside. Thompson & Merriam
on Juries, sec. 158;. Sealy vs. State, 1 Ga., 213;.
Warren vs. Commonwealth, 37 Penn. St., 45; U. S.
vs. Marchant, 12 Wheaton, 430; President, etc., of
Waterford and Whitehall Turnpike vs. People, 9
Barb., 161. This statute and the practice under it are
old enough to be a part of the common law system de-
rived from Great Britain, and some of our American
courts have followed the English practice. The rea-
son for the English rule was, that as the crown had no
peremptory challenges it was necessary to the admin-
istration of justice that those persons on the list who
did not stand indifferent to the crown, but against

whom no legal objection could be made, should stand aside until it could be ascertained whether or not an unobjectionable jury could be procured. In such case the defendant could not complain so long as he was tried by a fair and impartial jury, and his right to challenge peremptorily was held to be a right not to select, but to reject, so many on the list. The courts of Pennsylvania, South Carolina and North Carolina, and probably some others, early conformed to this practice, and so far as we know adhere to it. But other American courts under statutes allowing the state peremptory challenges along with the defendant, refused to follow the English practice because the reason of the rule had ceased. In Sealy vs. State, *supra*, where the trial court permitted the solicitor for the st..te to pass jurors by until the remainder of panel was gone through with, against the objection of the defendant, the judgment was reversed. The decision was based upon the ground that as the state had the right to peremptory challenges, she must stand upon a footing with the defendant. In the case of U. S. vs. Butler, I Hughes C. C. Rep., 457, Chief-Justice Waite said in reference to this practice that "the rule was in force where the government had no right of peremptory challenge, but as the right of challenging jurors peremptorily has been given the prosecution, it should stand on the same footing with the defense, and either exercise the right of challenge at once or not at all." This practice commends itself to us as entirely proper. The Revised Statutes gives

to the State and defendant each ten peremptory challenges, and to allow the State the further right of having jurors stand aside until the list is perused, would accord to the prosecution not only an unfair advantage, but a privilege that might result easily in abuses that would be difficult for a court to detect. Under the English practice, after the list presented was gone over, the crown had then to show cause, and could not without legal showing pass a juror. The juror Goleman was on one list and this was gone over, and instead of either accepting or rejecting him, on motion of the State he was taken from the jury box and placed at the foot of another special venire list. This we think was error. State vs. Shaw, 3 Iredell (Law), 532.

The defendant having exhausted his peremptory challenges before the special venire was gone over, and a timely objection having been made by him to the swearing of the twelfth juror, it can not be said that he is in no condition to complain by reason of having been tried by a jury of his own selection. It is of the first importance that the fairness and purity of jury trials should be preserved, and among the many rules adopted to accomplish such ends the right to challenge jurors has been given. Under our statute both the State and the accused stand upon an equal footing in this respect. In order to protect this right, as well as to guard against an abuse of it, it seems to us an erroneous decision in matter of law should be the subject of correction. The ruling of the judge in taking the juror Goleman, who had been accepted and sworn, from the jury box and placing his name at the

foot of the special venire, on the motion of the State, can not in our judgment be sustained without sanctioning a practice that is unwarranted. This conclusion is not antagonistic to the undoubted power of the court in the exercise of a sound discretion to excuse jurors who may be summoned into the court for the trial of a cause before they have been selected and sworn on juries. And even after they have been selected and sworn, for sufficient cause they may be excused by the court. Metzger vs. State, *supra;* John D. C. vs. State, *ex rel.*, 16 Fla., 554; Ellis vs. State, 25 Fla., 702, 6 South. Rep., 768.

The other assignments of error involve questions relating only to the organization of the jury, and need not necessarily arise on another trial of this case, and for this reason no disposition is made of them here.

For the error pointed out the judgment is reversed and a new trial awarded. Judgment here to be entered accordingly.