## WAYCASTER *v.* THE STATE.

1. The court committed no error in admitting testimony of statements made by the defendant.
2. Proof that a witness made previous statements contradictory to the statements he made while testifying is admissible, though the witness testifies that he does not remember whether or not he made such previous contradictory statements.
3. The credibility of a witness is to be determined by the jury; and it is error for the court to instruct the jury that if they believe a witness has made previous statements contradictory to his testimony delivered on the trial, such testimony should be disregarded unless it "is corroborated by other credible evidence, or is corroborated by the proven circumstances in the case."

MARCH 15, 1911.

Indictment for murder. Before Judge Maddox. Floyd superior court. August 13, 1910.

Clarence Waycaster was convicted of the murder of Charlie Pyle (sometimes also known as "Bull Dick"), and sentenced to life imprisonment. To the order of the court overruling his motion for a new trial he excepted. There were no eye-witnesses to the alleged homicide. The body of the deceased was found just off one of the streets of the city of Rome, lying in a ditch close to the sidewalk. One witness testified: "There did not seem to be but one wound, and that first wound was on his right cheek; it went off his cheek in the right shoulder under the collar bone, between the collar bone and the heavy part of the neck, and came out between the fourth and fifth ribs. . . If he was lying down, it was from a shoulder to this point in his side, whichever way that might have been. A part of the cheek was knocked off. The wound showed that it glanced down. There was one or two shots in the shoulder, possibly three, that seem to be scattered somehow or other. A shotgun made the wound. The person who made the shot would have had to have been above Pyle." A physician testified that his examination of the body disclosed a wound on the right cheek, about the upper jaw, and running down in between the collar-bone and the breast-bone, and another wound about the fifth lower rib from below. He further testified: "A part of the liver was protruding from the lower wound. This wound entered the body from above and came out in the side, as I have stated. Both wounds, including the glancing wound on the cheek, in my opinion, were made by the same shot ranging down-

ward. The wound described caused Charlie Pyle's death. The
party firing to shoot a man that way, to make that wound, would
have to be some distance above the party receiving the wound."
There was evidence tending to show that the wound was inflicted
by a discharge from a shotgun. There was also evidence that a
knife was found in the pocket of the deceased, and that a week
later a rusty knife was picked up at the place where the body
of the deceased was found. Both these knives and a shotgun were
introduced in evidence, a witness testifying that he got the gun
from the house of the deceased, and that at that time the right-
hand barrel was "about a half inch deep in dirt." A witness also
testified that a pint bottle, a little over half full of whisky, was
found in the pocket of the deceased. The body of the deceased
was discovered on Monday morning. Jim Wilder testified that
on the night before the body of the deceased was found, he, the
defendant, the deceased, and Sherman Thomas were engaged in
a crap game under an electric light on Chambers street, about
200 yards from where the body of the deceased was found. The
defendant and the deceased "fell out about the game," and the
deceased "picked up two rocks and throwed at defendant; de-
fendant broke and run over across the hill in the direction of
his home." He further testified: "They done like they were
playing to me. I didn't think they were mad much. I did not
see any whisky, did not see Pyle borrow defendant's knife. De-
fendant run and Pyle followed him. Pyle throwed two rocks
at defendant. I don't know how large they were. I saw Pyle
throw the rocks. I don't know how large the rocks were. Did
not hear them whiz. I was about 20 feet away. When Pyle
picked up the rocks, defendant was about twenty-five 'feet away
from him. At that time defendant was running. Sherman
Thomas told defendant he had better run. Defendant run after
he was told by Sherman he had better run. Pyle ran a few feet
after he picked up the rocks before he threw them at defendant.
Defendant was running fast. I saw defendant running and Mr.
Pyle after him about as far as from here across Fifth avenue. I
don't think Pyle had gained on defendant when they went out
of sight of me." The witness and Sherman Thomas then went
up Chambers street in an opposite direction from that in which
the defendant and the deceased were running. Before the wit-

ness got to his home, which was about half a mile from where
the body of the deceased was found, he heard a gun fire.   He
was then about a quarter of a mile from his house.   The witness
stated he did not know how the trouble between the deceased
and the defendant started.   The sheriff testified that the defendant
lived about 100 yards from the place of the alleged homicide, on
Perkins street, which ran parallel to Chambers street.   This wit-
ness further testified:    "Defendant was arrested about eleven
o'clock A. M. on the day Pyle's body was found.   I had a con-
versation with defendant at the jail on said day; he said, 'I want
to see Sherman Thomas, before I talk.'   After he saw Sherman
he told me he had shot Pyle and that he had to do it.   He said
he done the killing.   In the same conversation he said he had to
kill Pyle to save his own life.   He told me that they were in a
scuffle over a gun and the gun had got on Pyle's shoulder, that
he caught hold of the gun with both hands and pulled it down
and it fired.   Said Pyle had been running him.   Said he had
run him through his home, and that as he ran through his home
he got his gun.   I know he said he shot him to save his own life,
but he did not go into particulars."   J. E. Johnson, the deputy
sheriff, testified:   "The morning 'Bull Dick's' body was found I
had a conversation with Thomas; he said that 'Bull Dick' throwed
two rocks at defendant, and that defendant said, 'I will get some-
thing and be your equal,' and ran off up the hill, and Thomas
said that he himself then, said, 'Boys, let's get away from here;
that feller will come back and kill every one of us.'   Thomas,
looked like a sober man to me.   He was sober."   Sherman Thomas
testified:   "I was with the negro Wilder, the defendant, and
Pyle the night Pyle was killed.   I saw the beginning of the diffi-
culty between Pyle and the defendant.   It commenced over a
crap game.   We were shooting craps, and they got up a jower
over it some way, and they stepped a little bit, and Charlie Pyle
borrowed defendant's knife to open a pint of whisky.   Pyle gave
us all a drink.   I don't know where the whisky came from.   When
Pyle got defendant's knife, the game started again, they got up a
little argument.   Defendant, throwed the dice away and says, 'I'm
going home.'   Pyle says, 'You will have to pay me for the dice
first.   I want three dollars for them.   They cost three dollars.'
Pyle had the knife in his hand, and he grabbed at defendant.   It

was the knife he borrowed from defendant, and Pyle grabbed de-
fendant on the shoulder and said, 'God damn you, I'll kill you
right here, or you will pay me for the ,dice.' I started off, and
defendant run, and Pyle throwed a rock at him. I told Pyle not
to go after him, but he went anyway, and me and Raymond and
Wilder went on up the street. The last I saw of Pyle and de-
fendant they were going up the hill, and Pyle was going up be-
hind him and went out of sight. It was not over ten or fifteen
minutes after that until I heard the gun fire. . . I remember
making a written statement at the jail. I remember something
about it. . . I don't remember defendant saying anything at
all, as he went away,—the last trouble that I speak of between,
after we had all taken a drink of whisky. I remember something
about the conversation with Joe Johnson on the day he arrested
me, between the place where I was arrested and the jail. I re-
member telling him something, I don't remember telling him
that defendant said there and then as he started away, 'I will go
and get something, so I'll be your equal.' I don't know whether
I said that or not. I remember saying, 'Boys, we had better get
away.' I remember saying we had better get away from him,
defendant. I don't remember telling Mr. Johnson that defendant
said, 'I'll go and get something, so I will be your equal.' I do not
remember that defendant said that. I'll tell the truth: when I
had that conversation with Mr. Johnson I was about drunk enough
to be put in the station-house. I was pretty full. I don't remem-
ber much I told that day. I remember part of it. I drank whisky
that morning at the pool-room, Jack's pool-room. I don't re-
member that I told the solicitor-general that when Clarence got
away from 'Bull Dick' at the negro house he just said, 'Wait,
God damn you, I'll get you,' and went in the direction of his
house. I reckon I drank two or three pints of liquor, helped to
do it. . . Defendant told his mother he had shot 'Bull Dick,'
and he was in it for life, he guessed. Something that way. Said
he guessed he was in it for life. Next morning I went with de-
fendant to his nets. As we came back from the nets defendant
sold some fish to some negroes, and came out there further, and
somebody told us Pyle was killed up there on the hill. Defendant
says, 'That's bad, aint it; wonder who killed him?' . . If I
heard defendant say he would kill 'Bull Dick,' I don't remem-

ber.    Defendant said he killed 'Bull Dick,' and that 'Bull
Dick' ran him to the house, and that he grabbed his gun and run
out back down there and 'Bull Dick' caught him or something
or another, and 'Bull Dick' tried to take his gun from him and
had his knife and tried to get his gun.  He said 'Bull Dick' run
him up to the house and through the house.  I heard Pyle say he
would kill defendant before defendant had a chance to kill him.
'Bull Dick' said, 'You had the advantage of me awhile ago, but
I have the advantage of you now.  I will kill you, God damn you,
before you get a chance to kill me.'  'Bull Dick' said that after
the rocks were thrown.  Defendant was then going towards his
house up the hill."  The solicitor-general testified:  "Thomas
said to me, 'When Clarence got away from "Bull Dick" at the
negro's house, he said, "Just wait, God damn you, and I will get
you," and went in the direction of his house.' . .  I was pre-
paring the case for the State at the time I took down the state-
ment."  The defendant made the following statement:  "Well,
gentlemen, Pyle was after me with the knife, and I run from
him to get away from him, and I saw he was going to capture
me, and I turned on him, and as I turned he grabbed the muzzle
of the gun with one hand and had the knife drawn in the other,
and fell, and as he fell the gun fired and killed him.  There is a
little ditch there and he stepped in the ditch and fell, and as the
gun fired it killed him."

    *F. W. Copeland,* for plaintiff in error.  *H. A. Hall, attorney-
general,* and *John W. Bale, solicitor-general,* contra.

    HOLDEN, J.  (After stating the foregoing facts.)

    1.  In the first ground of the amendment to the motion for a new
trial, complaint is made that the court erred in admitting evidence
delivered by the sheriff to the effect that the defendant stated to him
in jail, on the day defendant was arrested, that he, the defendant,
killed the deceased.  It is contended that the defendant's state-
ments to the sheriff were not admissible, because they were not vol-
untarily made without being induced by another, nor free from the
slightest hope of benefit or the remotest fear of injury; which
objection to their introduction was urged by the defendant upon the
trial.  Defendant specifically contends that the deputy sheriff, a
short time previous to the confession proved, had told the de-
fendant "that he [meaning the officers] already had the proof

that defendant had killed the deceased, and that it would therefore be better for the defendant to admit the killing, as he could prove that it was done in self-defense," and that this inducement held out by the deputy sheriff was on the same day and a short time before the confession was made to the sheriff. In the 4th ground of the amendment to the motion, the defendant contends that the court erred in admitting the sheriff's evidence to prove a confession made to him by the defendant, because, on a preliminary hearing before the court in the absence of the jury, the deputy sheriff testified that he arrested the defendant, and that before he placed him in jail the witness told the defendant he had sufficient evidence to prove that he killed the deceased, and it would be better for him to go ahead and confess it; that he told defendant he understood the deceased had followed him with rocks and had run him with a knife, and it would be better for him to confess. Defendant told the witness he wanted to talk to Broach (the sheriff), and made no confession to the witness. The sheriff testified that the deputy sheriff was not present when the defendant confessed to the witness; that the confession was freely and voluntarily made without any threat or inducement; that the defendant said he wanted to see Sherman Thomas, and the witness brought Thomas to the defendant, and, after they talked together, the defendant then said he killed the deceased. "He said he killed the deceased to save his own life, that he was compelled to do it." The conversation between the accused and Johnson, the deputy sheriff, which counsel for the accused contends rendered the testimony of Broach, the sheriff, inadmissible, occurred soon after Johnson arrested the accused and before he was placed in jail. After the accused and Johnson had this conversation and before the accused made the statements to the sheriff, the accused was placed in jail, and the sheriff brought the witness Thomas to the accused, and the two latter had a conversation. If the defendant had made any confession, or incriminating statement, at the time Johnson told the defendant, among other things, "it would be better for him to go ahead and confess" the killing, such incriminating statement, or confession, would not have been admissible; but sufficient time elapsed between the time of the conversation between the accused and Johnson, and the time when the accused made to Broach

the statement to which objection was made, to make the testimony of Broach regarding the statement made to him by the accused prima facie admissible. Under the circumstances, it was a question for the jury whether or not the testimony of Broach should be considered by them. If the jury believed the defendant made to the sheriff any confession, or incriminating statement, but that on account of the previous conversation between the defendant and Johnson, or for any other reason, it was not "made voluntarily, without being induced by another, by the slightest hope of benefit or the remotest fear of injury," it would be the duty of the jury to disregard the testimony; otherwise, it would be their duty to consider it. *Dixon* v. *State,* 116 *Ga.* 186 (3) (42 S. E. 357); *Pines* v. *State,* 21 *Ga.* 227. The question we are dealing with is one concerning the admission of testimony of Broach, regarding statements made to him by the defendant, and is not one involving a charge regarding such statements.

2. Another ground of the amendment to the motion for a new trial is as follows: "Defendant says that the verdict should be set aside and a new trial granted, because the court admitted the evidence of the solicitor-general, Hon. J. W. Bale, and others, to impeach witness Thomas, over the objection of defendant, which objection was upon the ground that the witness Thomas did not deny the facts testified to by the solicitor-general and other witnesses on the subject of impeachment for the purpose of impeaching Thomas by proof of contradictory statements previously made material to his testimony." Thomas, a witness in behalf of the defendant, testified: "I don't remember that I told the solicitor-general that when Clarence got away from 'Bull Dick' at the negro house he just said, 'Wait, God damn you, I'll get you,' and went in the direction of his house." J. W. Bale, the solicitor-general of the Rome circuit, a witness in behalf of the State, testified that the witness did make such statement to him. The testimony of the solicitor-general was not inadmissible on the ground that "the witness Thomas did not deny the facts testified to by the solicitor-general." If a witness makes previous statements contradictory to the statements made while testifying, he can not prevent proof of them by testifying he does not remember whether or not he made such previous contradictory statements. *Sealy* v. *State,* 1 *Ga.* 213 (44 Am. D. 641). The ruling above

made is also applicable to the testimony of other witnesses who testified to previous contradictory statements made by the witness Thomas.

3. Complaint is made that the court erred in the following charge: "If you should believe from the evidence the witness Thomas made a statement relative to his testimony in the case, material to the issue, at some time prior when he was drunk, and which statement is contradictory to his testimony as delivered in this trial, and if you should believe from his evidence he was so drunk as not to know what was transpiring, or to realize or to understand what he was saying or doing, at such former time, then I charge you that any statement made at such prior time by him, if it was made at all, while he was in such condition, would not be sufficient to impeach his testimony as delivered by him as a witness in this case, nor would you consider any statement he might have made under such circumstances, as against the defendant on trial, in arriving at your verdict. On the other hand, if you should believe from the evidence he was not drunk, but that he understood what he was saying and doing, and you should believe from the evidence that at such prior time he made a statement, relevant to his testimony and to the case, material to the issue, in contradiction of his testimony as delivered in this trial, you should disregard his testimony unless his testimony as delivered in this trial is corroborated by other credible evidence or is corroborated by the proven circumstances in the case." One ground on which complaint is made against this charge is: "Because defendant contends that the court, in the expression, 'you should disregard his testimony unless his testimony as delivered in this trial is corroborated by other credible evidence or is corroborated by the proven circumstances in the case,' erred, in that the language used and excepted to took from the jury a question of fact that under the law was to be determined by the jury, and instructed the jury as a matter of law to disregard said Thomas's testimony unless corroborated by other credible evidence or proven circumstances." The charge was subject to the criticism made thereon, and constitutes error requiring a new trial. The credibility of witnesses is a question for the jury. If a jury believes that a witness has made statements prior to the time he is testifying, in contradiction to statements made in his testimony, the

jury may believe the statements made while testifying to be true, and that the previous contradictory statements made while not under oath are untrue. Civil Code (1910), § 5884, is as follows: "When a witness is successfully contradicted as to a material matter, his credit as to other matters is for the jury. But if a witness swears wilfully and knowingly false, his testimony ought to be disregarded entirely, unless corroborated by circumstances, or other unimpeached evidence. It is for the jury to determine the credit to be given his testimony where impeached for general bad character or for contradictory statements out of court." This section is omitted from the Penal Code, but the rule of law there announced is applicable to the testimony of witnesses in criminal cases as well as in the trial of civil cases. There are several ways in which a witness may be impeached. A witness is impeached when the jury is convinced by proof upon the trial that he is unworthy of credit. Whether or not a witness has been impeached is a question for the jury. The court is not authorized to instruct the jury that if they believe a witness has made previous statements contradicting his testimony delivered on the trial, such testimony should be disregarded unless it "is corroborated by other credible evidence, or is corroborated by the proven circumstances in the case." Even if the jury believe that a witness has made previous statements contradictory of statements made in his testimony, the jury may believe the latter statements to be true, and this the jury is authorized to do even though such statements are not in any way corroborated.

*Judgment reversed. Fish, C. J., absent. The other Justices concur.*