## NIX *v.* THE STATE.

1. The court did not err in admitting evidence of confessions made by the defendant.

2. The extracts read from a volume of law reports to the court in the presence and hearing of the jury were not of such character as to require the court, upon motion of counsel for the accused, to grant a mistrial, as they were not so inflammatory in character as to arouse prejudice against the accused, nor did they seek to introduce material facts connected with the case which had not been properly introduced in evidence.

3. Other remarks made by the solicitor-general in the course of his argument to the jury did not require a reversal of the judgment refusing a new trial, no motion for a mistrial having been made at the time in the trial court.

No. 1133. SEPTEMBER 2, 1919.

Indictment for murder. Before Judge Howard. Muscogee superior court. July 27, 1919.

*George C. Palmer* and *Gilbert E. Fincher,* for plaintiff in error. *Clifford Walker, attorney-general, C. F. McLaughlin, solicitor-general,* and *M. C. Bennet,* contra.

BECK, P. J. Bartow Nix was tried under an indictment charging him with the murder of C. L. Alexander and Jesse Everidge; and the jury trying the case returned a verdict of guilty, there being no recommendation made by them. The defendant made a motion for a new trial, which upon the hearing thereof the court overruled, and the defendant excepted.

1.  The original motion contained the general grounds.  In the first ground of the amendment to the motion complaint is made of the admission in evidence of a confession made by the defendant. This evidence, which is set forth in the motion in the form of questions and answers, shows that the prisoner was taken from Muscogee county to Macon, Georgia, where he was confined in jail. After he was in jail, according to the testimony of James Palmer, the witness whose testimony was admitted over objection, the accused made a complete confession, sustaining the charge as made in the indictment.  In response to questions propounded to him in the course of making the confession the prisoner fully and in detail stated the circumstances of the killing.  This confession was made first in a very short time after the arrival at the Bibb county jail, about 9 o'clock in the evening; and the witness Palmer then testified to a confession substantially the same, made by the accused the next morning.  The witness, after having testified to the confession, was interrogated by counsel for the accused as to the circumstances under which it was made; and this questioning of the witness elicited the testimony following: "Q.  What did you say to him on your way to Macon?  A.  We talked all the way along.  He never talked.  I told him before he ever went to talking, that there was one thing sure: that he never would no more in this world do his wife and children any more good.  Q.  You told him that, and that very naturally frightened him?  A.  I don't know whether it did or not.  Q.  You don't suppose that frightened him at all?  A.  It didn't seem to.  Q.  Up to that time he never had made any confession, had he?  A.  No. sir.  Q.  How come him to open up in the jail and tell you about it?  What was said to him there?  A. He just opened it himself.  Q.  Nobody never said anything to him at all?  A.  Of course he went to talking.  Q.  Who brought up the conversation?  Tell exactly just what you said to him.  A. I have told you just exactly what I said.  Q. No, you haven't.  What caused him to talk over there?  A.  He just went—we all set down there and he just opened up and went to talking, the same thing over.  Q.  What same thing over?  A.  About how he killed him.  Q.  Thought you said he never had told it before that?  A.  O, I told you before we went over there, before we got to Buena Vista.  Q.  I understood you to say when you got to the jail you tried to make him sit down and he stood up and that was

when he first told you how it happened. A. That was one time. Q. Where did he first tell you? A. Between here and Buena Vista, when I first went through there, he connected Will Howard; and Culver and Clements wanted me to 'phone back here and get them locked up, and I wouldn't do it, because I didn't believe it. Q. He didn't tell you then he killed them? A. Yes, sir. Q. What caused him to tell it? A. When I told him about his folks." Defendant's counsel moved to exclude this evidence of a confession, on the ground that in view of the testimony of the witness on cross-examination the confession was not freely and voluntarily made, but was induced by fear upon the part of the defendant, generated in his mind by the statement of Palmer to the defendant before the alleged confession was made, "that one thing was certain, he would never in this world do his wife and children any more good." The court overruled the motion to exclude the testimony, and admitted it.

We are of the opinion that the court properly overruled the motion. This confession was made on the next day when the prisoner was safely lodged in the jail of Bibb county and apparently safe from any danger whatever. Whether the confession made immediately after the statement to the prisoner, which we have quoted above, would have been admissible had not substantially the same confession been made the next day in the jail, we do not now rule.

Another witness, Clements, testified to a confession made by the accused on the way from Columbus to Macon, Georgia, and also testified in connection that he made the same confession to himself, to Palmer and Culver after he was in jail at Macon. The statement and confession made by the prisoner was made in response to questions propounded to him. On cross-examination this witness testified as follows: "Q. You say going to Buena Vista in the automobile you commenced talking to him about it? A. Yes, sir. Q. You told him that Albert had told it all, and he had just as well tell it? A. Told him Albert had owned up to it; yes, sir. Q. And he had just as well own up to it? A. Yes, sir." This testimony of the witness Clements as to the confession made by the prisoner was also objected to, and counsel for the defendant moved to exclude the same on the ground that it appeared that the confession was not freely and voluntarily made, but that the accused was induced to make it by the statement that "Albert had

owned up to it and he might as well own up to it." The person referred to as Albert was Albert Nix, who was jointly indicted with the accused. The motion to exclude the testimony was overruled. In this the court did not err. In view of all the facts and circumstances we think it was a question for the jury to decide as to whether the confession was freely and voluntarily made. The motion to exclude the testimony of Clements included the confession made in the jail on the next morning after the arrival, as well as the confession made on the way to Macon the day before, and was not directed solely to the admissibility of the alleged confession immediately following the statement made to the prisoner that Albert had confessed and he might as well "own up." Nor can we say that the statement made by Clements tended to induce the confession. There was no promise that it would be better for him or that it would inure in any way to his benefit for him to make a confession. The statement that one jointly indicted had confessed might have caused the prisoner to despair of making a successful defense, but we do not see anything in the circumstances to induce him to confess to anything that was not true in order to derive a benefit from the confession. In the case of *Dixon* v. *State,* 116 *Ga.* 186 (42 S. E. 357), it was said: "Though evidence of an incriminating statement made by a prisoner to another shortly after the latter had offered an inducement extending a hope of benefit is not admissible, another and entirely different incriminating statement, made hours afterwards to the same person under circumstances tending to show that it was purely voluntary and not elicited by such inducement, may be proved, the question whether or not the statement was in fact free and voluntary being one for determination by the jury." And in the case of *Waycaster* v. *State,* 136 *Ga.* 95 (70 S. E. 883), where the circumstances under which the confession was made tended more strongly than in the present case to show inducement to the confession, the court held that in view of the time that had elapsed between the time of the statement made by an officer, alleged to be an inducement, and the confession offered in evidence, it was a question for the jury to decide whether or not the testimony of the witness offered to prove the confession should be considered by them. See also *Wilson* v. *State,* 19 *Ga. App.* 759 (92 S. E. 309). The evidence of confession was prima facie admissible, and there was no complaint that the jury was not prop-

erly instructed and cautioned in regard to receiving the confession of guilt and that it was their duty to reject the confession entirely if it appeared that it was not freely and voluntarily made.

2. During his argument the solicitor-general read in the presence and hearing of the jury the following extract from the opinion in the case of *Eberhart* v. *State, 47 Ga.* 598: "It may be a sign of a tender heart, but it is also a sign of one not under proper regulation. Society demands that crime shall be punished and criminals warned, and the false humanity that starts and shudders when the axe of justice is ready to strike is a dangerous element for the peace of society. We have had too much of this mercy. It is not true mercy. It only looks to the criminal, but we must insist upon mercy to society, upon justice to the poor woman whose blood cries out against her murderers. That criminals go unpunished is a disgrace to our civilization, and we have reaped the fruits of it in the frequency with which bloody deeds occur. A stern, unbending, unflinching administration of the penal laws, without regard to position or sex, as it is the highest mark of civilization, is also the surest mode to prevent the commission of offenses." He also read the following extract from another decision of the same court, *Hawkins* v. *State, 25 Ga.* 207 (71 Am. D. 166): "Human life is sacrificed at this day, throughout the land, with more indifference than the life of a dog, especially if it be a good dog. Scott may not have been a good citizen, still he was a human creature, under the protection of the laws of the State; and even in his person, the punitory power of the government must be vindicated." The defendant thereupon made a motion for a mistrial, on the ground that the reading of the foregoing extracts in the presence and hearing of the jury was prejudicial to the interests of the defendant and tended to deprive him of a fair and impartial trial. The court overruled this motion, but made the following statement to the jury: "An objection was made to the reading from some volume of the court report by the solicitor-general—some report. The solicitor-general was reading from these volumes to the court. The court instructs you that you take no law from the counsel in this case. The court will charge you fully as to the law of the case; and that you should not take the law either from the solicitor-general or from counsel for the defendant." The court did not err in overruling this motion for a mistrial. The reading from

a Supreme Court decision of remarks like these may not be help-
ful to the jury in their effort to arrive at the truth from the evidence
in the case, but we do not think that the jury's hearing of these
extracts could tend to inflame their minds or arouse in their minds
prejudice against the defendant.   This differs from cases where
it has been held that a mistrial should have been granted where
inflammatory remarks were made, and where material facts or
circumstances tending to prejudice the cause of the defendant,
not contained in the evidence, were stated and brought to the
attention of the jury in the argument of counsel for the State.
Counsel for plaintiff in error does not undertake to specify the
particular passages in the extracts quoted which he criticizes as
being inflammatory and incendiary.   Certain sentences in the
extract quoted, it seems to us, could have been used with perfect
propriety by the solicitor-general in his argument to the jury.
He could certainly say with propriety: "A stern, unbending,
unflinching administration of the penal laws, without regard to
position or sex, as it is the highest mark of civilization, is also the
surest mode to prevent the commission of offenses." He could
appeal to the jury to show no mercy to crime, but to unflinchingly
administer the criminal laws.   If the passages were objectionable
at all, they were objectionable upon the ground that some of the
statements apparently introduced facts; as, for instance, the
sentence beginning with the statement that "Human life is
sacrificed at this day, throughout the land, with more indifference
than the life of a dog," etc.   Or again the statement, "That crim-
inals go unpunished is a disgrace to our civilization, and we have
reaped the fruits of it in the frequency with which bloody deeds
occur." But we desire to call attention to the fact that these
extracts were read from decisions that were delivered something
like a half century ago, and referred to the state of society then;
and if counsel for defendant had really thought that these remarks
were at all inflammatory or incendiary in their character or
prejudiced their client, he surely could have called attention to
the fact that the judges who rendered these opinions were speak-
ing of a state of society that existed a half century ago, and, in
one case, considerably over a half century ago, and the judges
who uttered them have long been mouldering in the ground and
their bodies have returned to dust.   When the later of these two

decisions was rendered we had 47 volumes of Georgia Reports; it was the decision in the case of *Eberhart* v. *State*. To-day we have 148 volumes. And the older of the two decisions, *Hawkins* v. *State,* was rendered before the Civil War. If counsel thought that the reading of these extracts from our decisions tended to incite the jury, he could easily have asked from what decisions they were read (if he did not know at that time), and could have called the attention of the jury to the date at which the judge was speaking; and the jury could very easily have seen that the state of society that the judge was speaking about was the state of society that existed a half century or more ago. Suppose that counsel had read from some decision in a criminal case, reported in one of the English reports, and the judge used similar remarks about the state of society and the frequency of crime, and it appeared that he was speaking of the state of society that existed two centuries or more ago; could it be claimed that the minds of the jury would be inflamed by reading such statements in their presence? Or suppose that counsel for the State, as a part of his address to the jury, had read or recited passages from some chapter in the Book of Isaiah, wherein the prophet had bewailed the prevalence of sin and misery and crime and bloodshed, and had read the scathing denunciations of these offenses against God and against righteousness; surely this could not be ground for granting a mistrial. It would not be said that facts were introduced by the reading of these statements which were calculated to injure the defendant. Attempts to arouse indignation against crime are permissible. In the case of *W. & A. Railroad Co.* v. *York,* 128 *Ga.* 687 (58 S. E. 183), which was an action for damages, counsel for the plaintiff, in the course of his argument before the jury, used the following language: "Man is the noblest creation of God. God made no greater creation than man. He is the grandest product of divine handicraft; and He hedged about him the law, 'Thou shalt not kill.' God told Cain that the blood of his brother Abel cried to him from the ground. The most eloquent sermon I ever heard in my life was from the text, 'The statutes of the Lord are right.' 'Thou shalt not kill' is the statute of the Lord God Almighty. It was made for the protection of the lord of creation— for man, and it applies to a railroad corporation just as much as it does to an individual. If a man is dead by the reckless negligence

of the servants and agents of the railroad corporation, the full consequences to him are the same; he is just as dead as if he had died by the uplifted and directed and murderous hand of his brother man. The shedding of innocent blood is just the same —just the same. Our land is defiled when innocent blood is shed therein, whether it be by the hand of a railroad corporation or whether it be by the murderer's hand or some one contending in a death grapple with his brother man; and the curse of God, which is charged against that, is upon it just the same. Gentlemen of the jury, when George W. York died on that public crossing in the City of Acworth, last October was a year ago, his innocent blood stained the right of way of this defendant." Whereupon counsel for the defendant moved the court to declare a mistrial upon the ground that the remarks by counsel for the plaintiff were improper. He refused to declare a mistrial, and exception was taken to this ruling. In discussing the exception this court said: "We do not think the remarks of counsel were of such character as to require the court to declare a mistrial. A mere flight of oratory of counsel when addressing the jury is not ground for mistrial. Counsel may bring to his use in the discussion of the case well-established historical facts and may allude to such principles of divine law relating to transactions of men as may be appropriate to the case. It is not impassioned oratory which the law condemns and discredits in the advocate, but it is the introduction of facts not disclosed by the evidence, which requires the judge to use his power of declaring a mistrial. In this connection, see *W. & A. R. Co.* v. *Cox,* 115 *Ga.* 719 [42 S. E. 74]; *Patterson* v. *State,* 124 *Ga.* 409; *Taylor* v. *State,* 121 *Ga.* 354 (7) [52 S. E. 534]; *McNabb* v. *Lockhart,* 18 *Ga.* 507, and cit. An examination of the remarks of counsel which are complained of will show that there was no effort to introduce any fact not disclosed by the evidence." Here, as will be observed, the court states the rule to be that "it is the introduction of facts not disclosed by the evidence, which requires the judge to use his power of declaring a mistrial." And the facts not in the record which the court is ruling that it is improper for counsel to introduce in his argument are material facts which might be considered by the jury as entering into a determination of the main question of fact before them; that is, whether in a criminal case the defend-

ant on trial is guilty or not guilty. Now, who will suppose for a moment that what a judge said about the frequency of crime in the state of society which existed here before and immediately after the Civil War will be considered by the jury in making up their minds upon the evidence in the case before them. And counsel for the defendant could, in a word or two, have called attention to the date of these utterances; it cannot be imagined that the court would have refused him permission to do this, if he had asked it. At any rate, the statements in the opinions referred to were not of any facts which could have been connected with the facts of the case on trial, so as to influence the jury in their deliberations; and the denunciation of crime and the appeal for a righteous verdict and an unflinching administration of the law was not improper from any standpoint.

3. Complaint is made, in another ground of the motion for a new trial, that during the course of his argument to the jury the solicitor-general turned to the defendant and in the presence and hearing of the jury said: "Are you defending this case out of the money you got from the pockets of your victim?" Counsel for the defendant immediately objected to this conduct upon the part of the State's counsel, and the court thereupon said: "I don't think, Mr. Solicitor, it is a good idea to address your remarks to the man on trial. I think that is improper. Address your remarks to the jury. I think when counsel asks defendant a question, that defendant's counsel has a right to reply to it." While the remark of counsel for the State to the defendant in the presence of the jury was improper, we think that the court's saying to him that it was improper was of the character of a rebuke. To say to counsel in the presence of the jury, "Your conduct is improper," can not be regarded otherwise than as a rebuke to counsel. And in view of this rebuke administered by the court, thereby showing to the jury that the remark of counsel was improper and that the court disapproved of it, we do not think that the improper remark of counsel requires the grant of a new trial. Whether it would have been error to refuse the grant of a mistrial on motion by counsel is a different question not made in this record, as there was no motion made for a mistrial upon this ground.

The evidence authorized the verdict, and the court did not err in refusing a new trial.

*Judgment affirmed. All the Justices concur except*

ATKINSON and HILL, JJ., dissenting as to the ruling in the second division of the opinion of the court.

The case of *Styles* v. *State,* 129 *Ga.* 425 (59 S. E. 249, 12 Ann. Cas. 176), was one complaining of the judgment of the trial court in refusing a new trial to the defendant after he had been convicted of murder. Shortly before the trial Lyle had been tried in the same court, and, commenting upon the trial of that case, the Savannah Morning News published an editorial as follows: "The Opinion of a Solicitor-General. Commenting upon the outcome of the Lyle murder trial at Waycross, solicitor-general Bennett was quoted as saying: 'I have given the matter a great deal of thought, and I have come to the conclusion that human life is too cheap in this country, due to the fact that juries are too lax in enforcing the law.' Further along in his talk he said: 'There are entirely too many homicides in this and other counties. Take the Dominion of Canada, divided from this great country only by an imaginary line, and you will find that there are nearly 100 homicides in the United States to one in Canada. There is but one explanation. In Canada the law is enforced, and in the United States it is not. The law says that the punishment of a person convicted of murder shall be death, and it does seem to me that if this law were enforced and the punishment meted out to persons where there is no doubt of their guilt, it would prove a great benefit, and deter others who are inclined to commit like crimes.' The foregoing is safe and sound doctrine. If it had the approval of juries generally, there wouldn't be an account of a homicide in the newspapers of this State every day or two. Only last Saturday we commented upon the need of a stricter enforcement of the law against carrying concealed weapons, the occasion being reports of two homicides in the State on the previous day. Yesterday there was another homicide at Macon, the victim having just been indicted for the alleged cause of the crime. As to the truth or falsity of the charge that led to the shooting, we do not undertake to express an opinion, but we do know that the law should have been permitted to take its course. We can not have safety for life and property if men are permitted to take the law into their own hands when they feel they have a grievance. As a rule there are two sides to every case, and the safety and well-being of society requires that a jury shall decide which is

the right side, and measure out punishment to the guilty. It is impossible to predict where this thing is going to stop if men are permitted to go about their daily duties carrying concealed weapons, which they use promptly on various degrees of provocation, because they believe that the danger of being punished is very remote. We do not comment on the Lyle trial, because it is probable that the accused will have to face a jury again within a very few days; but we are free to say that there are scores of persons in this State, guilty of shedding human blood, who would now be in the penitentiary or would have paid the penalty of their crimes on the scaffold if absolute justice had been meted out to them. And what is true as to this State is true as to about every other State. It is true, as solicitor-general Bennett says, life is so cheap in this country that it is a difficult matter to get a jury to find a verdict of guilty, even when the evidence of guilt is overwhelming. In Canada the law against murder is enforced vigorously and swiftly. The consequence is, the number of homicides is small in comparison with the number in this country. What is needed is a stirring of the consciences of the people. They must have impressed upon them the sacredness of human life. When they have a proper regard for it, juries will not be swayed by sentiment or seek excuses to avoid their duty."

The paper containing the above editorial was read by members of the jury after they had been empaneled to try Styles; and that fact, having come to the knowledge of the defendant and his counsel for the first time after rendition of the verdict, was made the basis of one of his grounds for motion for new trial. It was held, in effect, that the matter contained in the editorial got before the jury improperly, and, being calculated to prejudice the jurors against Styles, that it was error requiring a reversal for the judge to refuse a new trial based on that ground. In the course of the opinion it was said, among other things: "An examination of the editorial will show clearly that it is argumentative in favor of convictions in capital cases such as the one on trial. Either a casual or a most scrutinous reading of the article will lead to that conclusion, and to none other. It was not only argumentative, but almost of coercive character, in that it criticised juries for failure to convict. The charge inferentially made was that the conditions in this country were such that jurors would not

convict in murder cases 'even where the evidence of guilt was overwhelming.' It was stated that the remedy needed was a 'stirring of the consciences of the people.' What effect this appeal actually had upon the minds of the jurors it is impossible to say. That it was an irregularity follows from the fact that the article was read by the jurors after they had qualified, without the knowledge or consent of the court or of the defendant or his counsel. It was read after the jurors had been put upon their voir dire. Whether, after reading the article, the jurors would again have said that their minds were perfectly impartial between the State and the accused, or that there was no bias or prejudice resting upon their minds either for or against the accused, we have no means of knowing. Those questions were not again put to the jurors. It is possible that the minds of the jurors may have been so influenced by the article as to render them unable to answer the statutory questions in such way as to leave them competent to try the accused. Again, treating the article as an address to the jurors, it would be improper for at least two reasons: first, because it was made by one not authorized to participate in the trial in an advisory or any other way; second, because it was made without the knowledge or consent of the defendant or his counsel, and there was no opportunity to reply. The possible harm to the defendant that could result from an editorial is incalculable. It was well said by Wood, J., in Cartwright v. State, 71 Miss. 82, 14 So. 526, that 'this method of communicating to and impressing upon the jury, or any member of it, the opinion of others is open to the same condemnation which would be visited upon oral expressions of opinion touching a defendant, injected into the body of the jury by some designing intermeddler. The widely-read and influential daily journal, speaking for, as well as to, the public, reflecting popular sentiment, as well as making it, must be held to be much more powerful in influencing the average man than any expression of opinion by a single, private individual.'

"It is insisted that the defendant could not have been injured, because the article did not make reference to the particular case on trial. The fact that the case is not specially named does not necessarily deprive the argument for conviction, as contained in the editorial, of its injurious effect. The argument made no excep-

tions and was addressed to all prosecutions in murder cases, which in general terms embraced the case under consideration. The subject of the editorial was of the same class as the subject of the case on trial. The editorial was apparently from a disinterested source, and for that reason may have produced an effect even more harmful to the defendant than if the case had been specially named; for in the latter case the jury might at least have attributed to the writer the interest of a partisan. The whole tendency of the editorial was to play upon the passions and emotions of those who read it, and to encourage juries to convict in capital cases. An appeal of that character, whether made by a writer, an orator from the pulpit, or an actor upon the stage, may be made with such effect as to influence the mind while acting upon any particular matter, without direct reference thereto. When a juror enters upon the trial of a criminal case, the law contemplates his withdrawal from the public and makes no provision for addresses to him from outside sources, for his entertainment or otherwise, which are calculated, directly or indirectly, to excite any passions or emotions with respect to the matter upon which he is to sit in judgment. Perfect impartiality in the juror is the object of the law. Anything not legitimately arising out the trial of the case, which tends to destroy the impartiality of the juror, should be discountenanced. Whether beneficial to the State or to the accused, such things, upon the ground of irrelevancy, should be suppressed and not given the opportunity of influencing the minds or exciting the passions of the jurors. Verdicts should be the result of calm deliberation, founded upon the law and evidence. The accomplishment of that object can never be assured where irrelevant things which tend to destroy the impartiality of the jurors are allowed to creep into the trial.

"We know of only three cases which have been before this court where it was argued that a new trial should have been granted upon the ground that the jurors, after having been impaneled, had been permitted to read newspapers. *Fogarty* v. *State,* 80 *Ga.* 450 [5 S. E. 782]; *Flanegan* v. *State,* 64 *Ga.* 52; *Hunter* v. *State,* 43 *Ga.* 483 (6). In the two cases first mentioned this court declined to interfere with the discretion of the trial court in refusing to grant a new trial, because it was not shown that any harm had resulted to the defendant by the reading of the news-

paper. In the *Fogarty* case the opinion recites that 'the record discloses that the copies of the paper which the jurors were reading contained nothing about the case except the fact that the case was on trial.' It was not made to appear in either of those cases, other than as just stated with reference to *Fogarty's case,* what the paper contained, and therefore it was not affirmatively shown by the movant, upon whom the burden rested to show error, that anything appeared in the paper which it was improper for the jury to see. Those cases were different from the case under consideration in that respect, because in the present case it was affirmatively shown what the paper contained, and that the article in question was of such character as tended to render the jurors incompetent to serve in the case. In this way it is made affirmatively to appear that harm has been done to the defendant. In the last of the three cases cited (*Hunter* v. *State,* 43 *Ga.* 483) the article contained in the paper was one referring to the case by name as an important case, and severely criticising counsel for the accused because of certain language employed by counsel in his argument for a change of venue. The paper was read by the jurors in the presence of the court and of counsel for the accused, who, although seeing them reading the paper, made no objection until after the verdict. In dealing with that ground of the motion for new trial, the court, speaking through Chief Justice Lochrane, said: 'In relation to a portion of the jury, before the completion of the panel, reading the 'Quitman Banner,' it appears that this newspaper contained no portion of the testimony either for or against the prisoner, but contained a diatribe against one of the counsel of the accused for a speech made on a motion to change the venue. It is difficult to draw any line sufficiently well marked to constitute a rule upon this subject, and we can readily appreciate the propriety of keeping the jury, from the moment they are sworn in chief, away from all influences and communications which might, in the most remote degree, influence their verdict; but we are not prepared to say that the reading of a mere newspaper under the circumstances, being known to the counsel of the accused, not excepted to by him then and there, and transpiring in open court, would constitute a ground of error sufficient to set aside a verdict. On the contrary, we hold that it would not.' It will be observed that the court in that case 'appreciated the

propriety of keeping the jury . . away from all influences and communications which might in the most remote degree influence their verdict,' but placed the ruling refusing to order a new trial mainly upon the proposition that counsel did not move at the proper time. This was in accordance with the rule which is now better recognized, that when a party moves for a new trial on the ground of misconduct of a juror, he must aver and show affirmatively that both he and his counsel were ignorant of the misconduct charged, until after the verdict. *Wynn* v. *City & Suburban Ry.,* 91 *Ga.* 344 [17 S. E. 649] ; *Cogswell* v. *State,* 49 *Ga.* 103 ; 12 Enc. Pl. & Pr. 553, 558. While *Hunter's* case, supra, did not comply with this rule, Styles, the defendant in the present case, did comply by making the affirmative showing.

"There are other cases, in which new trials have been ordered upon the ground of misconduct upon the part of the jurors. These cases did not involve the question of the propriety of the jurors reading newspapers; but the rulings made in them go to the preservation of the purity of jury trials, and the principles announced in them are applicable to the facts in this case. We will deal with some of them. The case of *Shaw* v. *State,* 83 *Ga.* 92 [9 S. E. 768], was where the misconduct complained of consisted in the jury attending a prayer-meeting conducted by the prosecutor in the case. Upon arrival the jurors were shown to their seats by the prosecutor, separate and apart from the remainder of the congregation. Prayers were offered for the court and its officers, but no reference was made to the particular case on trial. There was shouting at the meeting. In passing upon this case the following was announced in the headnote : 'Where misconduct of a juror or of the jury is shown, the presumption is that the defendant has been injured, and the onus is upon the State to remove such presumption by proper proof. While reviewing courts are loth to interfere with the decision of the trial judge that the presumption has been removed, such decision is in this State subject to review. The misconduct of the jury and of the officers in charge of them in this case was of such character as to require a new trial.' In the course of the opinion it was said by Mr. Justice Simmons: 'There are many things which can be done by individual members of the jury, or by the whole jury, which are susceptible of such clear explanation that the trial judge

would be authorized in refusing to set the verdict aside. There are other things, however, which if done by an individual member of the jury, or by the whole jury, are so contrary to the public policy of the State in the procurement of fair and impartial trials for the citizens of the State as to require that a verdict rendered by such jury be set aside, whether the defendant has been injured thereby or not; and in our opinion, the case under consideration belongs to this class. The State is jealous of the rights and liberties of its people. When one of its citizens is accused of crime, it throws around him all the safeguards that are possible in order to procure him a fair and impartial trial. It requires the officer who has charge of the particular jury to swear, in substance, in open court, to take them to the jury-room and there keep them safely, and not to communicate with them himself or suffer any one else to communicate with them, unless by leave of the court. The law contemplates that when a jury are selected and sworn to try a citizen for felony, they shall be entirely separated from the world, and that no communication whatever shall be had with them from the beginning of the trial until the verdict is reached, unless by leave of the court. It contemplates that no outside influence shall be brought to bear on the minds of the jury, and that nothing shall occur outside of the trial which shall disturb their minds in any way; that the minds of the jury shall be entirely occupied with the consideration of the case which they are sworn to try.' The case of *Smith* v. *State, 122 Ga.* 154 [50 S. E. 62], presents another instance where the judgment of the lower court was reversed because it refused to grant a new trial upon the ground of misconduct upon the part of the jurors. It is unnecessary here to make further reference to the misconduct complained of. In this case it was said: 'This court from the time of its organization to the present time, has striven to protect the purity and impartiality of jury trials; and wherever there have been irregularities, unless fully explained and the court satisfied that the accused has not been injured, new trials have been granted. Where the misconduct of the officers and jury has been gross, this court and others have held that a new trial should be granted on account of public policy, whether the accused was injured or not.' The case of *Obear* v. *Gray,* 68 *Ga.* 182, presents another instance where a new trial was granted because the court refused to set aside a verdict because

of improper conduct of the jurors. In this case Mr. Justice Crawford, speaking for the court, said: 'But other and quite as serious complaints are made in reference to allowing the jury to be carried to the public park, a place of great resort, especially on Sundays, and allowing them whilst there to pass about and to separate for some considerable time. Every jury is to be carried to the jury-room, or some other private and convenient place, where they are not to be spoken to by the officer having them in charge or others, unless by leave of the court. To take them, therefore, to a park, which is said to be a place of great public resort especially on the Sabbath day, where they are almost sure to hear something said about the case, whether they would or not, is most clearly a violation of the spirit and purpose of the law in withdrawing them from the body of their fellow citizens until they have agreed upon their verdict. We think that this was a good ground upon which to set aside the verdict, unless it was clearly shown that no such things occurred while they were in the presence and hearing of other visitors. It is true that the affidavits offered show everything necessary to purge them, except that it does not appear but that they heard bystanders make remarks about the case. To make the purgation complete, this should affirmatively appear. 37 *Ga.* 332; 38 Ib. 216; 56 Ib. 653.' We do not deem it necessary to make further reference to any of the cases cited in the several cases to which we have alluded.

"Under the view we take of the case the editorial complained of dealt with a subject so related to the case on trial as to make its reference applicable to that case; and, because of its argumentative character and its tendency, through appeals to the emotions and passions of jurors, to displace the element of impartiality in the minds of the jurors, it was harmful to the accused in that it tended to deprive him of a fair and impartial trial. He brought himself under the rule by making complaint in the manner and at the time authorized by law, and the judge should have granted a new trial."

In this connection see, *Alabama Great Southern Railroad Co.* v. *Brown* 140 *Ga.* 792 (79 S. E. 1113, Ann. Cas. 1915A, 1159). In *Smoot* v. *State,* 146 *Ga.* 76 (90 S. E. 715), it was held: "It was error requiring a new trial to refuse to grant a mistrial on account of remarks of counsel for the State in regard to bad

character of the accused, when he had not put his character in issue." The basis of the ruling was that the argument of counsel for the State put before the jury irrelevant matter prejudicial to the accused, which was not in evidence and could not have been introduced by the State. In the course of the opinion it was said that "the objectionable remarks of the prosecuting attorney injected before the jury substantive matter which could not have been introduced by the State, and which was prejudicial to the accused and was calculated to have the same effect as if evidence thereof had been improperly admitted and the attorney had argued it for consideration by the jury. The introduction of such facts by the speech of an attorney is outside of the latitude of speech to which he is entitled. *Morris* v. *Maddox,* 97 *Ga.* 575 (2), 581 (25 S. E. 487); *W. & A. R. Co.* v. *York,* 128 *Ga.* 688 (58 S. E. 183); *W. & A. R. Co.* v. *Cox,* 115 *Ga.* 715 (42 S. E. 74); *Augusta &c. R. Co.* v. *Randall,* 85 *Ga.* 297 (11 S. E. 706). Like other irrelevant evidence calculated to prejudice the jury against the accused, it has a tendency to injure him before the jury. In some cases the injurious effect may be averted by appropriate action and instructions from the court (Civil Code, § 4957); but what would be sufficient in any case would depend on the character of the remarks, the nature of the case, and the action or instructions from the court relied on to counteract the effect of the improper remarks. *O'Dell* v. *State,* 120 *Ga.* 152 (6), 154 (47 S. E. 577). These may differ in each case. It is not erroneous to refuse to grant a mistrial on account of improper remarks by counsel, if it is certain that no injury could have resulted therefrom to the accused. *Lee* v. *State,* 116 *Ga.* 563 (42 S. E. 759). But if it can be reasonably inferred that the jury were thereby in any way unfavorably affected against the accused, a mistrial should be ordered or a new trial granted. *Hudson* v. *State,* 101 *Ga.* 520 (3), 524 (28 S. E. 1010); *Ivey* v. *State,* 113 *Ga.* 1062 (39 S. E. 423, 54 L. R. A. 959). In the interest of fair trials, it should clearly appear that there was no probability of injury to the accused likely to result from the misconduct. The character of the remarks in this case was such as to put before the jury facts of a substantive nature, irrelevant, but tending to unduly prejudice the jury against the accused, as already pointed out; but how firmly they may have found lodgment in the minds of the jury and influenced the verdict

can only be left to conjecture. The judge was unsuccessful in his attempt to stop the attorney before completing the objectionable remarks. While he attempted, by reprimanding the attorney and giving instructions, to prevent the minds of the jury from being affected by the statements, the instructions did not clearly inform the. jury that the character of the accused, which the attorney had stated was bad, was not in issue; but from the statement 'that, in the absence of proof of bad character by the defendant, it must be presumed that there was nothing derogatory to his character,' the jury might have inferred that the character of the accused had some bearing upon the case. Considering the character of the remarks, the circumstances of their delivery, and the instructions of the court in regard thereto, it can not be said that the accused had a fair trial."

We have quoted at length from the decisions in the cases above cited, because the discussions in them are helpful in the consideration of the present case. While the cases are not alike in all respects, they are sufficiently so to render the principles applied in the cases cited applicable to the case under consideration. The excerpts from the decisions of this court read by the solicitor-general had no relevancy to the case on trial, and could not have been introduced as evidence; yet they were put before the jury and embodied statements of facts irrelevant to the case on trial, tending to prejudice the jury against the accused, and arguments tending to influence the jury against the accused. By that method the solicitor-general put before the jury remarks of this court not relevant to the case on trial, and which should no more have been permitted than similar remarks by any outside individual. They were all the more harmful to the accused because they were the expressions of this court. Under the circumstances it can not be said that the defendant had the fair and impartial trial to which he was entitled under the law, and the judgment of the trial court should be reversed upon that ground.